**GARY I. GRENLEY**, OSB No. 75138
ggrenley@grebb.com
**PAUL H. TRINCHERO**, OSB No. 014397
ptrinchero@grebb.com
GRENLEY, ROTENBERG, EVANS,
  BRAGG & BODIE, P.C.
1211 S.W. Fifth Avenue, Suite 1100
Portland, OR  97204
Telephone:  503/241-0570
503/241-0914 (fax)

Attorneys for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| SVETLANA BELOVA, Derivatively on Behalf of TRIQUINT SEMICONDUCTOR, INC., | Lead Case No. CV-07-0299-MO |
| Plaintiff, | CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS FILED BY DEFENDANTS AND NOMINAL PARTY TRIQUINT SEMICONDUCTOR, INC. |
| vs. | |
| STEVEN J. SHARP, et al., | |
| Defendants, | |
| – and – | |
| TRIQUINT SEMICONDUCTOR, INC., a Delaware corporation, | |
| Nominal Defendant. | |

CONSOLIDATED OPP TO MOTIONS TO DISMISS FILED BY DEFS &
NOMINAL PARTY TRIQUINT SEMICONDUCTOR, INC.

# TABLE OF CONTENTS

**Page**

I.    Introduction ............................................................................................................1

II.   Statement of Facts ..................................................................................................5

III.  Argument .................................................................................................................9

    A.    The Complaint Easily Satisfies the Delaware Legal Standards for Pleading
          Demand Futility .................................................................................................9

    B.    The Court Should Reasonably Infer that Backdating Occurred at TriQuint
          During the Relevant Period .............................................................................13

          1.    Plaintiffs' Analysis Supports the Reasonable Inference that
                Options May Have Been Manipulated at TriQuint ...................................14

          2.    Defendants' Remaining Challenges to Plaintiffs' Option Grant
                Analysis Are All Procedurally Improper ..................................................18

                a.    Defendants Are Not Entitled to the Inferences They Seek
                      on a Rule 23.1 Motion ...................................................................18

                b.    The Court Should Not Accept Defendants' Self-Interested
                      Conclusion that No Backdating Occurred .....................................19

                c.    This Court May Not Weigh Evidence on a Rule 23.1
                      Motion ............................................................................................21

          3.    Defendants Sharp and Kauser Received Backdated Options,
                Rendering Them Interested ........................................................................23

          4.    Gibson, Rhines, Gary and Kauser Awarded Backdated Options,
                Which Was Not a Legitimate Exercise of Business Judgment.................24

          5.    Gibson, Rhines, Gary, and Kauser Also Face a Substantial
                Likelihood of Liability, Excusing Demand ...............................................28

          6.    Defendants Concede that Quinsey and Sharp Are Not Independent .........29

    C.    Plaintiffs' Allegations Satisfy *Aronson* and Thus Rebut the Business
          Judgment Rule .................................................................................................31

    D.    "Exculpatory Provisions" in TriQuint's Certificate of Incorporation Do
          *Not* Support Dismissal Here............................................................................32

**Page**

E.    The Miscellaneous Attacks on Plaintiffs' Fiduciary Duty- and Equity-Based Claims Lack Merit.........................................................................................33

    1.    Insider Trading.........................................................................................33

    2.    Corporate Waste and Unjust Enrichment .................................................33

    3.    Gross Mismanagement and Abuse of Control ...........................................34

    4.    Accounting and Rescission .......................................................................35

F.    Plaintiffs Have Standing to Bring this Action .......................................................35

IV.    Plaintiffs Adequately Plead Federal Securities Law Violations .........................................37

A.    Legal Standards for a Motion to Dismiss under Rule 12(b)(6) ............................37

B.    Plaintiffs Sufficiently Aver Claims Under §14(a) of the Exchange Act ..............37

C.    The Complaint's §10(b) Claim Is Actionable.......................................................41

    1.    Legal Standards for Pleading a Violation of §10(b) .................................41

    2.    The Complaint Adequately Alleges Falsity...............................................41

    3.    The Complaint Adequately Alleges Scienter.............................................42

        a.    Engaging in Backdating and/or Receiving Backdated Options Demonstrates a Strong Inference of Scienter..................42

        b.    Defendants' Violation of GAAP and TriQuint's Stock Option Plans Raise a Strong Inference of Scienter.......................45

        c.    Certain Defendants' Sarbanes-Oxley Certifications and Other SEC Filings Support the Scienter Allegations...................46

    4.    Plaintiffs Adequately Plead Reliance........................................................48

    5.    Plaintiffs Adequately Plead Loss Causation .............................................50

    6.    Plaintiffs Sufficiently Plead Violations of Rule 10b-5(a) and (c), Which Prohibit (Among Other Conduct) Engaging in a Scheme to Defraud and/or Insider Trading ................................................................52

CONSOLIDATED OPP TO MOTIONS TO DISMISS FILED BY DEFS &amp;
NOMINAL PARTY TRIQUINT SEMICONDUCTOR, INC.

Page ii

**Page**

       a.     Certain Defendants Engaged in Stock Option Backdating, Which Is Deceptive Conduct ...........................................................52

       b.     Certain Defendants Engaged in Insider Trading, Which Is Deceptive Conduct .........................................................................53

V.     Defendants' Time-Based Defenses Lack Merit ...................................................54

    A.    Plaintiffs' §10(b), §14(a) and Breach of Fiduciary Duty Claims Are Timely ...........................................................................................54

    B.    Defendants Cannot Rely on Any Statute of Limitations Defense, for Plaintiffs Adequately Plead Fraudulent Concealment ...........................................58

VI.    Conclusion ...........................................................................................................59

# TABLE OF AUTHORITIES

**Page**

## CASES

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002).............................................................................45

*Arnold v. Soc'y for Sav. Bancorp.*,
650 A.2d 1270 (Del. 1994) ............................................................................25

*Aronson v. Lewis*,
473 A.2d 805 (Del. 1984) ........................................................................ *passim*

*Barnebey v. E.F. Hutton & Co.*,
715 F. Supp. 1512 (M.D. Fla. 1989)..............................................................50

*Beneville v. York*,
769 A.2d 80 (Del Ch. 2000)...........................................................................10

*Borden, Inc. v. Spoor Behrins Campbell & Young*,
778 F. Supp. 695 (S.D.N.Y. 1991)................................................................57

*Chiarella v. United States*,
445 U.S. 222 (1980)........................................................................................54

*Citron v. Fairchild Camera & Instrument Corp.*,
569 A.2d 53 (Del. 1989) ..........................................................................20, 31

*Conley v. Gibson*,
355 U.S. 41 (1957)..........................................................................................37

*Conrad v. Blank*,
No. 2611-VCL, 2007 WL 2593540
(Del. Ch. Sept. 7, 2007) ............................................................................ *passim*

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)...........................................................................50, 51, 52

*Durning v. Citibank, Int'l*,
990 F.2d 1133 (9th Cir. 1993) .......................................................................56

*Emerald Partners v. Berlin*,
726 A.2d 1215 (Del. 1999) ............................................................................32

*Falkowski v. Imation Corp.*,
309 F.3d 1123 (9th Cir. 2002) .......................................................................48

**Page**

*Galdi v. Jones*,
    141 F.2d 984 (2d Cir. 1944)........................................................................................35

*Gatz v. Ponsoldt*,
    925 A.2d 1265 (Del. 2007) ...................................................................................9, 19

*Hendry v. Hendry*,
    No. 12236, 2006 Del. Ch. LEXIS 99
    (Del. Ch. May 30, 2006) ..........................................................................................35

*Howard v. Everex Sys.*,
    228 F.3d 1057 (9th Cir. 2000) .................................................................................48

*Howley v. Town of Stratford*,
    217 F.3d 141 (2d Cir. 2000)....................................................................................14

*In re Accelr8 Tech. Corp. Sec. Litig.*,
    147 F. Supp. 2d 1049 (D. Colo. 2001)....................................................................50

*In re Baxter Int'l, Inc. S'holders Litig.*,
    654 A.2d 1268 (Del. Ch. 1995)...............................................................................12

*In re CNET Networks, Inc.*,
    483 F. Supp. 2d 947 (N.D. Cal. 2007) ............................................................ *passim*

*In re Computer Scis. Derivative Litig.*,
    No. CV 06-05288 MRP (Ex), 2007 WL 1321715
    (C.D. Cal. Mar. 26, 2007) ............................................................................. *passim*

*In re Cooper Cos., Inc. S'holders Derivative Litig.*,
    No. 12584, 2000 Del. Ch. LEXIS 158
    (Del. Ch. Oct. 31, 2000)..........................................................................................30

*In re Daley's Dump Truck Servs.*,
    108 F.3d 213 (9th Cir. 1997) ..................................................................................50

*In re Daou Sys.*,
    411 F.3d 1006 (9th Cir. 2005) .................................................................................45

*In re Dynex Capital Sec. Litig.*,
    No. 05 Civ. 1897 (HB), 2006 U.S. Dist. LEXIS 4988
    (S.D.N.Y. Feb. 10, 2006) ........................................................................................56

**Page**

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    235 F. Supp. 2d 549 (S.D. Tex. 2002) ...........................................................................58

*In re Lattice Semiconductor Corp. Sec. Litig.*,
    No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262
    (D. Or. Jan. 3, 2006) ......................................................................................................47

*In re Openwave Sys. Inc. S'holder Derivative Litig.*,
    No. C06-03468 SI, 2007 WL 1456039
    (N.D. Cal. May 17, 2007) ........................................................................................17, 22

*In re Ply Gem Indus., S'holders Litig.*,
    No. 15779-NC, 2001 Del. Ch. LEXIS 84
    (Del. Ch. June 26, 2001) .................................................................................................30

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001).............................................................................................44

*In re Stone & Webster, Inc. Sec. Litig.*,
    No. 00-10874-RWZ, 2006 U.S. Dist. LEXIS 42061
    (D. Mass. June 23, 2006) ...............................................................................................57

*In re Syncor Int'l Corp. Sec. Litig.*,
    327 F. Supp. 2d 1149 (C.D. Cal. 2004) .........................................................................48

*In re Tower Air, Inc.*,
    416 F.3d 229 (3d Cir. 2005)............................................................................................32

*In re Tyson Foods, Inc. Consol. S'holder Litig.*,
    919 A.2d 563 (Del. Ch. 2007)...............................................................14, 27, 29, 43

*In re UnitedHealth Group PSLRA Litig.*,
    No. 06-cv-1691 (JMR/FLN), 2007 U.S. Dist. LEXIS 40623
    (D. Minn. June 4, 2007) .................................................................................................43

*In re Zoran Corp. Derivative Litig.*,
    No. C 06-05503 WHA, 2007 U.S. Dist. LEXIS 43402
    (N.D. Cal. June 5, 2007) ........................................................................... *passim*

*Kahn v. Seaboard Corp.*,
    625 A.2d 269 (Del. Ch. 1993)........................................................................................58

**Page**

*Kamen v. Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991)........................................................................................................9

*Knollenberg v. Harmonic, Inc.*,
    152 F. App'x 674 (9th Cir. 2005) ...............................................................................38

*Kohls v. Duthie*,
    791 A.2d 772 (Del. Ch. 2000).....................................................................................10

*Malone v. Microdyne Corp.*,
    26 F.3d 471 (4th Cir. 1994) .........................................................................................45

*McMullin v. Beran*,
    765 A.2d 910 (Del. 2000) ............................................................................................20

*Mizel v. Connelly*,
    No. 16638, 1999 Del. Ch. LEXIS 157
    (Del. Ch. July 22, 1999)...............................................................................................30

*No. 84 Employer-Teamster Joint Council Pension
    Trust Fund v. Am. West Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ................................................................................37, 53

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).........................................................................................44

*Omni Fin. Corp. v. Cohen*,
    No. 91 Civ. 6837 (RO) (THK), 1994 U.S. Dist. LEXIS 3357
    (S.D.N.Y. Mar. 22, 1994) ............................................................................................55

*Platt v. Richardson*,
    No. 88-0144, 1989 WL 159584
    (M.D. Pa. June 6, 1989) ...............................................................................................20

*Primavera Familienstiftung v. Askin*,
    173 F.R.D. 115 (S.D.N.Y. 1997) .................................................................................50

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) .....................................................................................44

*Quaak v. Dexia, S. A.*,
    357 F. Supp. 2d 330 (D. Mass. 2005) ..........................................................................56

**Page**

*Rales v. Blasband,*
    634 A.2d 927 (Del. 1993) ..................................................................................... *passim*

*Rothman v. Gregor,*
    220 F.3d 81 (2d Cir. 2000) ............................................................................................ 44

*Ryan v. Gifford,*
    918 A.2d 341 (Del. Ch. 2007) .............................................................................. *passim*

*SEC v. Adler,*
    137 F.3d 1325 (11th Cir. 1998) .................................................................................... 54

*Shaw v. Digital Equip. Corp.,*
    82 F.3d 1194 (1st Cir. 1996) ......................................................................................... 54

*Siemers v. Wells Fargo & Co.,*
    No. C 05-04518 WHA, 2006 U.S. Dist. LEXIS 60858
    (N.D. Cal. Aug. 14, 2006) ............................................................................................. 58

*Simpson v. AOL Time Warner Inc.,*
    452 F.3d 1040 (9th Cir. 2006) ...................................................................................... 53

*Smith v. Van Gorkom,*
    488 A.2d 858 (Del. 1985) ....................................................................................... 20, 31

*Southland Sec. Corp. v. INSpire Ins. Solutions Inc.,*
    365 F.3d 353 (5th Cir. 2004) ........................................................................................ 48

*Space Systems/Loral, Inc. v. Lockheed Martin Corp.,*
    No. C96-03418 ST, 2006 WL 279331
    (N.D. Cal. Feb. 6, 2006) ................................................................................................ 14

*Steiner v. Meyerson,*
    No. 13139, 1995 Del. Ch. LEXIS 95
    (Del. Ch. July 18, 1995) ................................................................................................ 30

*Stroud v. Grace,*
    606 A.2d 75 (Del. 1992) ................................................................................................ 25

*Superintendent of Ins. v. Bankers Life & Cas. Co.,*
    404 U.S. 6 (1971) .......................................................................................................... 52

**Page**

*Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*,
    330 F.3d 1110 (9th Cir. 2003) ...........................................................................14

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    No. 05 Civ. 1898 (SAS), 2005 U.S. Dist. LEXIS 19506 (S.D.N.Y. Sept. 6,
    2005), *cert denied*, 2006 U.S. Dist. LEXIS 52991 (S.D.N.Y. Aug. 1, 2006)...................57

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    __ U.S. __, 127 S. Ct. 2499 (2007)...........................................................37, 42

*TSC Indus. v. Northway, Inc.*,
    426 U.S. 438 (1976).........................................................................40

*United States v. O'Hagan*,
    521 U.S. 642 (1997)......................................................................53, 54

*United States v. Redwood City*,
    640 F.2d 963 (9th Cir. 1981) ..............................................................37

*Virginia Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991).......................................................................40

*White v. Panic*,
    783 A.2d 543 (Del. 2001) ...............................................................9, 19

*Zimmerman ex rel Priceline.com, Inc. v. Braddock*,
    No. 18473-NC, 2002 Del. Ch. LEXIS 145
    (Del. Ch. Dec. 20, 2002) ...............................................................9, 19

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §77k..............................................................................................38
    §78c(a)(10)......................................................................................48
    §78j(b)................................................................................... *passim*
    §78n(a).................................................................................. *passim*
    §78t(a)............................................................................................37
    §78u-4(b)(2) ....................................................................................42
    §7241.............................................................................................47

28 U.S.C.
    §1658(b).........................................................................................55

**Page**

Federal Rules of Civil Procedure
    Rule 23.1 ................................................................................ *passim*
    Rule 8(a)(2) ...............................................................................51
    Rule 12(b)(6) ........................................................................31, 37
    Rule 12(e) ..................................................................................36

17 C.F.R.
    §240.10b-5 ........................................................................ *passim*
    §240.10b-5(a) .......................................................................41, 52
    §240.10b-5(b) .........................................................................4, 41
    §240.10b-5(c) .......................................................................41, 52
    §240.13a-15(e) ..........................................................................47
    §240.15d-15(e) ..........................................................................47

## SECONDARY AUTHORITIES

1 David A. Drexler, *et al.*, *Delaware Corporation Law and Practice* (1999)
    §15.05[1] ...................................................................................20

Richard W. Jennings & Harold Marsh, Jr., *Securities Regulation: Cases and
    Materials* (3d ed. 1972).............................................................38

Charles Alan Wright, Arthur Miller, & Mary Kay Kane, *Federal Practice and
    Procedure; Civil* (3d ed. 2007)
    §1828.........................................................................................36

## I.    Introduction

As the Chancellor of Delaware's Chancery Court recently discussed, option "backdating" involves a company issuing stock options to directors or executives on one date, while providing fraudulent documentation asserting that the options were actually issued on an earlier, more advantageous date. *See Ryan v. Gifford*, 918 A.2d 341, 345 (Del. Ch. 2007).  Backdated options can provide a windfall for recipients, because falsely dated stock option grants often coincide with monthly lows in the corporation's stock price. *Id.*  Essentially, backdating reduces the strike prices and inflates the value of stock options, increasing management compensation. *Id.*  This practice clearly violates the terms of stock option plans, such as TriQuint Semiconductor, Inc.'s ("TriQuint" or the "Company") shareholder-approved stock option programs, which require strike prices to be "***not less than 100% of the fair market value per share on the date of grant***." ¶50.[1]  Moreover, this practice "runs afoul of many state and federal common and statutory laws that prohibit dissemination of false and misleading information." *Ryan*, 918 A.2d at 345.

The Company's motion seeking dismissal of this action pursuant to Fed. R. Civ. P. 23.1 ("Rule 23.1") turns on whether plaintiffs have adequately alleged that option grants at TriQuint were backdated, retroactively priced or otherwise manipulated.  The Individual Defendants' Motion similarly rests on whether backdating is alleged.[2]  The Company's Memorandum[3] in support of its

---

[1]    All "¶" and "¶¶" references are to plaintiffs' Verified Consolidated Shareholders Derivative Complaint (the "Complaint").  Citations and footnotes are omitted and emphasis is added unless otherwise noted.

[2]    Individual Defendants' Memorandum of Points and Authorities in Support of the Individual Defendants' Motion to Dismiss the Verified Consolidated Shareholder Derivative Complaint, hereinafter "Defs' Mem. at __."

motion devotes most of its substantive argument to attempt to convince this Court that "no backdating occurred" at TriQuint. Indeed, the Company's motion, which is purportedly directed to the pleading, reads more like a brief in support of summary judgment or a judgment on the pleadings, as it continually relies on the "evidence" – including the self-interested conclusion by certain unidentified members of TriQuint's "management" that they did not backdate options, and the Company's self-styled statistical analysis of the grants plaintiffs challenged in the Complaint. The Court is not required to determine whether option grants at TriQuint were actually manipulated based on the facts alleged in the Complaint. Defendants will have an opportunity to bring their evidentiary motions later at summary judgment and/or trial.

For now, however, the plaintiffs have alleged facts which support a reasonable inference that option dates were manipulated at TriQuint, and that inference is well supported under the developing body of case law demonstrating demand futility may be adequately pleaded by showing statistically fortuitous and otherwise suspicious option grants. As stated by Chancellor Chandler in *Ryan* in considering backdating allegations based on a similar analytical model,

> Either defendant directors knowingly manipulated the dates on which options were granted, or their timing was extraordinarily lucky. Given the choice between improbable good fortune and knowing manipulation of option grants, the Court may reasonably infer the latter, even when applying the heightened pleading standards of Rule 23.1.

---

[3]    Nominal Defendant TriQuint Semiconductor, Inc.'s Memorandum of Points and Authorities in Support of Nominal Defendant TriQuint Semiconductor, Inc.'s Motion to Dismiss the Verified Consolidated Shareholder Derivative Complaint for Failure to Make a Pre-Suit Demand, hereinafter "TriQuint Mem. at __."

*Ryan*, 918 A.2d at 355 n.34.[4]  *Accord Conrad v. Blank*, No. 2611-VCL, 2007 WL 2593540, at *1 (Del. Ch. Sept. 7, 2007) (12 of 51 grants fell on fortuitous dates); *In re Zoran Corp. Derivative Litig.*, No. C 06-05503 WHA, 2007 U.S. Dist. LEXIS 43402, at *27-*28 (N.D. Cal. June 5, 2007) (7 of 32 grants fell on fortuitous dates).  Despite TriQuint's implications to the contrary, plaintiffs need not demonstrate "by a preponderance of the evidence" that options were backdated at TriQuint.  Thus, even though plaintiffs must allege demand futility with particularity, they need not win the battle of competing inferences on this Rule 23.1 motion.

Plaintiffs have easily satisfied the reasonable inference standard as they have alleged facts based on widely accepted analytical models which courts, commentators and academics have utilized to detect potentially manipulated option grants at publicly traded corporations.  *See infra* §§II, III.B.1.  Plaintiffs have analyzed certain TriQuint option grants based on the price swings in the Company's common stock and have compared the returns from those challenged grants to stockholder returns during comparable periods.[5]

---

[4]     Indeed, Chancellor Chandler, well aware of the nation's ongoing stock option backdating scandal and the multitude of similar shareholder derivative actions being decided under Delaware law in courts across the country, recognized that the holding in *Ryan* would be instructive in cases such as the instant action:

> The allegations in this case involve backdating option grants and whether such practice violates one or more of Delaware's common law fiduciary duties . . . Delaware courts have not as yet addressed these fundamental issues.  Nevertheless, Delaware law directly controls and affects many of the option backdating cases . . . By directly stating the fiduciary principles applicable in this context, Delaware courts may remove doubt regarding Delaware law and avoid inconsistencies that might arise in . . . other state or federal courts . . . .

*See Ryan*, 918 A.2d at 350.

[5]     The methodology used by plaintiffs to identify stock option grants likely to have been manipulated at TriQuint, if anything, is more thorough than the model which was endorsed by the

If this Court concludes that there was a reasonable inference that option grants were manipulated at TriQuint, it follows *a fortiori* demand is excused in this action because a majority of the directors on whom a demand would have been made either received manipulated option grants or made and approved those option grants while members of the Board's Compensation Committee. Tellingly, the Company tacitly acknowledges this point as it hardly expends any true effort to rebut this well-established proposition. The reasons why are clear – receiving or awarding manipulated option grants is not a protected business judgment and it renders those who do so "interested" in challenged conduct, as defendants' own authority acknowledges.

In addition to bringing well-pleaded claims for breach of fiduciary duty, plaintiffs bring well-pleaded claims for violations of the federal securities laws. As former SEC Chairman Harvey Pitt stated, backdating "likely renders a company's proxy materials false and misleading." ¶7. This case is no exception and plaintiffs' claims alleging violations of §14(a) are actionable. *See infra* §IV.B. The Complaint also properly alleges falsity, scienter, reliance and loss causation in support of plaintiffs' claims for violations of §10(b). *See infra* §IV.C. Backdating stock options is inherently deceptive conduct and defendants do not (and cannot) show that the strong inference of scienter plaintiffs draw from the facts is anything but reasonable. *See infra* §IV.C.3. Defendants ignore the allegations they made false and misleading statements. They are subject to liability under Rule 10b-5(b) for signing and/or preparing TriQuint's false and misleading SEC filings. *See infra* §IV.C.2.

---

Chancellor in *Ryan*. Plaintiffs' model examines specific option grants with a view of the 20-day period ***prior*** to each grant, not just the 10 or 20 days following the grant, and it screens grants under the methodology employed by the Center for Financial Research and Analysis. *See Ryan*, 918 A.2d at 346. As made clear recently in *In re Computer Scis. Derivative Litig*., No. CV 06-05288 MRP (Ex), 2007 WL 1321715, at *14 (C.D. Cal. Mar. 26, 2007), "the detailed statistical analysis that the plaintiffs employed in *Ryan* is not necessary to making particularized allegations of backdating," but such analysis is "compelling."

Contending that plaintiffs cannot state claims under Rule 10b-5's other prongs, (a) and (c), defendants incorrectly suggest backdating is not deceptive conduct, and overlook that engaging in insider trading is deceptive conduct as well.  *See infra* §IV.C.6.

Defendants assert time-based defenses to all of plaintiffs' claims.  Backdating, conduct extremely difficult to detect, went on at TriQuint for almost ten years before it was discovered. Further confounding the possibility of detection, defendants repeatedly represented stock options were priced as of the date of the grant and in accordance with TriQuint's stock option plans. Defendants' assertions that SEC filings disclosing the existence of option grants provided inquiry notice are meritless.  Indeed, judges have repeatedly rejected such arguments.  And as explained by Chancellor Chandler in *Ryan*, the nature of this case presents an exceptional circumstance for application of equitable tolling.  Plaintiffs timely brought their claims and defendants cannot rely on any statute of limitations defense, for plaintiffs adequately plead fraudulent concealment.  *See infra* §V.

## II.    Statement of Facts

The Action is brought on behalf of nominal defendant TriQuint, against certain of the Company's current and former officers and directors,[6] seeking to remedy defendants' breaches of fiduciary duties, insider trading and unjust enrichment in connection with their option backdating practices.  Plaintiffs assert claims for, *inter alia*, violation of §§10(b) and 14(a) of the Securities Exchange Act of 1934, breaches of fiduciary duty, abuse of control, constructive fraud, corporate

---

[6]      Defendants in the action are: Steven J. Sharp ("Sharp"), J. David Pye ("Pye"), Edson H. Whitehurst, Jr. ("Whitehurst"), Edward C.V. Winn ("Winn"), Stephanie J. Welty ("Welty"), Thomas V. Cordner ("Cordner"), Raymond A. Link ("Link"), Bruce R. Fournier ("Fournier"), Charles Scott Gibson ("Gibson"), Walden C. Rhines ("Rhines"), Paul A. Gary ("Gary"), and Nicolas Kauser ("Kauser") (collectively "defendants").  ¶¶20-31.

waste, unjust enrichment, and gross mismanagement, arising out of a scheme and wrongful course of conduct whereby defendants granted and/or received backdated TriQuint stock option grants during the relevant period, to and for the benefit of TriQuint's directors and top executive officers.  ¶1.

Backdating the issuance of stock option grants to defendants not only violated TriQuint's publicly disclosed, shareholder-approved stock option programs,[7] but it was also in breach of defendants' fiduciary duties of good faith, fair dealing, and loyalty to TriQuint.  *See Ryan*, 918 A.2d at 357-58.  Due to defendants' conduct, TriQuint has been damaged and it is exposed to further damages resulting from costly investigations by the Securities and Exchange Commission ("SEC") and the Office of the United States Attorney for the District of Oregon (the "U.S. Attorney").  ¶3.

The backdated and retroactively priced or otherwise manipulated options of which plaintiffs now complain were granted pursuant to the Company's Stock Option Programs, which strictly required option strike prices be "***not less than 100% of the fair market value per share on the date of grant***."  ¶50.  That has been a consistent fundamental requirement of the Stock Option Programs.

Another fundamental requirement of the Stock Option Programs has been that the administrator – the Board's Compensation Committee (the "Compensation Committee") – approve the grants under the Stock Option Programs and determine fair market value to be the closing price of TriQuint's stock for the trading day on the date the grant determination is made.  *Id.*  During the relevant period, among others, defendants Gary, Gibson, Kauser and Rhines each served at various times as members of the Compensation Committee.  ¶¶28-31, 108.  Their responsibilities have never been anything less than full responsibility, authority and discretion to determine and grant stock

---

[7]    During the relevant period, stock options were granted to TriQuint insiders pursuant to the Company's shareholder-approved 1996 Stock Option Program and amendments thereto (collectively, the "Stock Option Programs").  ¶¶49-50.

options (including the exercise prices) as a committee.  ¶52.  And nobody else has ever held the shareholders' delegated authority to so grant stock options.  *Id.*

Contrary to defendants' public disclosures and the covenants that defendants made when they solicited shareholder approval of the Stock Option Programs, however, stock options at TriQuint were not granted at "fair market value" on the date of the grant during the relevant period, but were in fact backdated, or otherwise manipulated.  ¶¶54-62.  Backdated options granted in violation of the terms of the plans were highly, but illegally, favorable to, among others, defendant Sharp, the longtime Chairman of the Board and the Company's former President and Chief Executive Officer ("CEO"), and defendant Kauser.  *Id.*

Plaintiffs identified the alleged backdated grants in this case using accepted analytical methodologies.  Plaintiffs first screened grants using the methodology reported (and since accepted by courts) in the May 16, 2006 report by the Center for Financial Research and Analysis, entitled "Options Backdating – Which Companies Are at Risk?" (the "CFRA Report").  In so doing, plaintiffs assessed (1) whether the price on the grant date is within 105% of the 10- or 40-day period stock price low following date of grant; and (2) whether the stock price range for the 40-day period (highest stock price minus lowest stock price) is greater than 10% of the lowest stock price. Plaintiffs then employed the analysis set forth in the Merrill Lynch report, entitled "Options Pricing - Hindsight is 20/20," where plaintiffs compared annualized 20-day stock returns following option pricing events to the stock's calendar year annual return.

In at least eight separate instances, option grants were purportedly dated just prior to a sharp increase in the trading price of TriQuint stock and/or at the bottom of a steep drop in the stock's price.  *Id.*  For example:

- On October 18, 1999, the Company allegedly granted options with an exercise price of $57.50, equal to ***the second lowest closing stock price for not only October 1999,***

*but for the entire fiscal quarter*.  Within 20 trading days of this grant, the Company's stock price rose *more than 57%*.  ¶¶50, 57.

- On December 1, 1999, the Company allegedly granted options with an exercise price of $84.50, equal to *the lowest closing stock price for December 1999*.  Within 20 trading days of this grant, the Company's stock price rose over *29%*.  ¶¶50, 58.

- On April 4, 2001, the Company allegedly granted options with an exercise price of $10.38, which was nearly *the lowest closing price for April 2001, the entire fiscal quarter, and the entire fiscal year*.  Within 20 trading days of this grant, the Company's stock price rose by *186.5%.*  ¶¶50, 60.

- On December 21, 2001, the Company allegedly granted options with an exercise price of $11.19, which was equal to the second lowest closing price for December 2001 and the entire fiscal quarter, and the third lowest closing price for the entire fiscal year.  Within 10 trading days of this grant, the Company's stock price rose over 13%, with the annualized increase being 482%.  By comparison, TriQuint stock held by shareholders throughout 2001 decreased in value by 68%.  ¶¶50, 61.[8]

Making matters worse, defendants concealed their misconduct during the relevant period by, *inter alia*, disseminating to shareholders and filing with the SEC annual proxy statements that falsely reported the dates of stock option grants and falsely represented that options were granted to defendants at the "fair market value" of TriQuint stock on the date of the purported grant.  ¶¶66-98.  Moreover, certain of the defendants, including Sharp, Gary, Gibson and Rhines, sold more than *$70 million* worth of artificially inflated TriQuint stock into the market during the relevant period, based on their possession of material, adverse, non-public information – *i.e.*, defendants' option backdating scheme and the Company's false and misleading financial statements.  ¶101.

The option backdating scheme at TriQuint began to unravel on October 25, 2006, when *The Oregonian* published an article identifying TriQuint as one of three large public companies in Oregon that appeared to have (as the empirical data set forth in the Complaint shows) "*especially favorable . . . beneficial timing*" of stock option grants.  ¶3.  The following day, *The Oregonian*

---

[8]    Thus, plaintiffs' allegations of "highly suspicious timing" of the option grants are supported by empirical data.  *See Ryan*, 918 A.2d at 354.

reported that defendants "*declined to explain or . . . document how they chose their grant dates*." *Id.* In October and November 2006, respectively, the SEC and the U.S. Attorney commenced investigations into the Company's historical stock option backdating practices. *Id.* In addition, on November 9, 2006, defendants disclosed that the Company's management – apparently, *not its directors* – had undertaken an internal review. ¶137.

As discussed more fully below, plaintiffs did not make a pre-suit demand on the  Board because no demand was required as a matter of law.  This is indisputable for a number of reasons, most notably that defendants Sharp, Kauser, Gibson, Rhines and Gary – or five out of the seven directors on the Board at the time this action was initiated – *received and/or authorized the award of backdated options during the relevant period.*  ¶¶107-08.

## III.    Argument

### A.    The Complaint Easily Satisfies the Delaware Legal Standards for Pleading Demand Futility

Defendants concede, as they must, that the question of whether a demand is excused in this case, as with all matters of substantive corporate law, must be analyzed under the laws of the State of Delaware, TriQuint's state of incorporation.  *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96-97 (1991).  *See also* TriQuint Mem. at 5 n.5.  Under Delaware law, a pre-suit demand on a board of directors need not be made if the facts alleged tend to demonstrate such a demand would have been futile.  *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984).  In determining the sufficiency of a pleading under Rule 23.1, a court must accept as true *all* particularized facts alleged in the complaint, and the court also must draw *all* reasonable factual inferences in favor of plaintiffs.  *Gatz v. Ponsoldt*, 925 A.2d 1265, 1274-75 (Del. 2007); *White v. Panic*, 783 A.2d 543, 549 (Del. 2001); *Zimmerman ex rel Priceline.com, Inc. v. Braddock*, No. 18473-NC, 2002 Del. Ch. LEXIS 145, at *27 (Del. Ch. Dec. 20, 2002); *Ryan*, 918 A.2d at 357.

Delaware law recognizes two instances where a plaintiff is excused from making demand. *Ryan*, 918 A.2d at 352. Failure to make demand may be excused if a plaintiff can raise a reason to doubt that: (1) a majority of the board is disinterested (or independent), or (2) the challenged acts were the product of the board's valid exercise of business judgment. *Aronson*, 473 A.2d at 812.[9] Plaintiffs easily satisfy this standard. The applicability of the *Aronson* test is also a matter of which TriQuint concedes, as it must.

A director is disqualified from considering a demand where there is a reasonable doubt that he or she is "interested" in a challenged financial transaction. *Aronson*, 473 A.2d at 812. As stated by the Delaware Supreme Court:

> A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders. Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation [or] the stockholders. In such circumstances, a director cannot be expected to exercise his or her independent business judgment without being influenced by the adverse personal consequences resulting from the decision.

*Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993).

Demand is futile as to defendants Sharp and Kauser, for they received backdated options. ¶50. Consequently, they received personal financial benefits which were not equally shared by TriQuint shareholders, and are directly "interested" in a demand under the ***first*** prong of the *Aronson* test. *See Aronson*, 473 A.2d at 812. *See also Conrad*, 2007 WL 2593540, at *7 ("the two directors who allegedly received backdated options . . . are clearly not disinterested"); *Zoran*, 2007 U.S. Dist.

---

[9]    Defendants do not dispute (TriQuint Mem. at 3) demand futility must be evaluated based upon the composition of the Board at the time the action was initiated. *Beneville v. York*, 769 A.2d 80, 85-86 (Del Ch. 2000). Accordingly, plaintiffs need only raise reason to doubt the disinterestedness or independence of four out of the seven TriQuint directors. *See, e.g., id.*; *Kohls v. Duthie*, 791 A.2d 772, 781 (Del. Ch. 2000).

LEXIS 43402, at *43 (holding that directors who were alleged to have received backdated stock options accordingly "***could not have responded in a disinterested manner to a demand***"); *In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 958 (N.D. Cal. 2007) (holding that where "plaintiffs can plead with particularity that the directors received backdated grants, those directors will be considered interested"); *Ryan*, 918 A.2d at 356 (member of the board who accepted backdated options "incapable of impartially considering demand").

Demand is futile as to defendants Gibson, Rhines, Gary and Kauser under the ***second*** prong of the *Aronson* test. Members of a board's compensation committee who administered backdated options are "interested" in a demand arising out of such practices. *Ryan*, 918 A.2d at 354-55. *See also Conrad*, 2007 WL 2593540, at *8-*9 (demand excused as to the three compensation committee members where, as here, option plans required grant date control option price); *Zoran*, 2007 U.S. Dist. LEXIS 43402, at *69-*70 (where compensation committee members "had the sole authority to decide option-grant dates and to ensure that options were being granted at fair market value on the date of the grant," it "is a reasonable inference at the pleading stage" that those same directors acted in bad faith).

For example, in *Ryan*, as in the instant action, "the alleged facts suggest that the director defendants violated an express provision of . . . [Maxim's] option plans and exceeded the shareholders' grant of express authority." *Ryan*, 918 A.2d at 355. In concluding that demand was futile as to the compensation committee members under the second prong of the *Aronson* test, the Chancellor stated:

> Plaintiff here points to specific grants, specific language in option plans, specific public disclosures, and supporting empirical analysis to allege knowing and purposeful violations of shareholder plans and intentionally fraudulent public disclosures. Such facts, in my opinion, provide sufficient particularity in the pleading to survive a motion to dismiss for failure to make demand pursuant to Rule 23.1.

*Id.*  Defendants Gibson, Rhines, Gary and Kauser approved backdated options while serving on the Compensation Committee and are therefore disabled for purposes of considering a litigation demand arising out of alleged stock option backdating.[10]  Indeed, a demand in such an instance would have challenged the very option grants in which they were involved.

Moreover, ***even if*** the decisions of Maxim's compensation committee were not imputable to Maxim's entire board, thereby implicating *Aronson*, "demand would remain futile under the [substantial likelihood of liability/interestedness] *Rales* test."  *Ryan*, 918 A.2d at 355.  *Accord Conrad*, 2007 WL 2593540, at *7-*9.  "Directors who are sued have a disabling interest for pre-suit demand purposes when 'the potential for liability is not a mere threat but instead may rise to a substantial likelihood.'"  *Ryan*, 918 A.2d at 355 (citing *In re Baxter Int'l, Inc. S'holders Litig.*, 654 A.2d 1268, 1269 (Del. Ch. 1995)).  As Chancellor Chandler held in *Ryan*:

> A director who approves the backdating of options faces at the very ***least*** a substantial likelihood of liability, if only because it is difficult to conceive of a context in which a director may simultaneously lie to his shareholders (regarding his violations of a shareholder-approved plan, no less) and yet satisfy his duty of loyalty. Backdating options qualifies as one of those 'rare cases [in which] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists.

*Ryan*, 918 A.2d at 355-56.  *Accord Conrad*, 2007 WL 2593540, at *8-*9.  Accordingly, demand is also excused because defendants Gibson, Rhines, Gary and Kauser each face a substantial likelihood of liability for their conduct as members of the Compensation Committee.

Similar to the plaintiffs in *Ryan* and *Conrad*, plaintiffs here allege that, during the relevant period, two TriQuint directors (Sharp and Kauser) received backdated options, while four TriQuint

---

[10]    As recognized in *CNET*, "[t]he [option grant] measurement date cannot occur until the options are approved by those with authority to do so."  483 F. Supp. 2d at 956.

directors (Gibson, Rhines, Gary and Kauser) were members of the Compensation Committee and administered backdated options and/or issued false and misleading statements regarding their adherence to the terms of the Stock Option Programs.  ¶¶50-64, 108.  *See Ryan*, 918 A.2d at 356 ("Plaintiff alleges that three members of a board ***approved*** backdated options, and another board member accepted them.   These are sufficient allegations to raise a reason to doubt the disinterestedness of the current board and to suggest that they are incapable of impartially considering [a] demand."); *Conrad*, 2007 WL 2593540, at *8 (three compensation committee members plus two interested directors). Accordingly, plaintiffs have raised sufficient allegations to raise a reason to doubt the disinterestedness of at least five of the seven current TriQuint directors and to suggest that they are incapable of impartially considering demand. *Id.*[11]  For the same reasons (among others), as more fully described below, TriQuint's motion should be denied.

### B.    The Court Should Reasonably Infer that Backdating Occurred at TriQuint During the Relevant Period

On a Rule 23.1 motion, a plaintiff need only allege facts which create a "reason to doubt" that demand would have been futile.  *Aronson*, 473 A.2d at 812; *Rales*, 634 A.2d at 934.  In the stock

------

[11]      In support of their claims that demand was required, defendants cite *Computer Sciences*, a recent shareholder derivative action based on option backdating which was dismissed on demand futility grounds.  TriQuint Mem. at 7.  However, *Computer Sciences* is easily distinguishable from the instant action for a number of reasons, most notably because less than half (three out of seven) of the Computer Sciences directors were alleged to have received and/or administered the challenged option grants.  As such, there was "a clear four-director board majority whose disinterestedness and independence is not placed in reasonable doubt by [p]laintiffs' allegations."  *Computer Sciences*, 2007 WL 1321715, at *13.  By contrast, here plaintiffs allege with particularity that a majority – at least five out of seven – TriQuint directors received and/or approved backdated stock options.  In addition, the *Computer Sciences* court noted that eight of the ten challenged option grants were dated within one or two weeks of May 1 every year, which "strongly suggests a standardized timing for the option grants."  *Id.* at *14.  That is not the case here, as plaintiffs' allegations of backdating at TriQuint are "compelling" and supported by "statistical analysis."  *See id.* at *14.

option backdating context, a plaintiff can satisfy this burden if it alleges facts from which the court could reasonably infer that option grants *may have* been backdated. *Ryan*, 918 A.2d at 355 n.34. At this stage of the action, plaintiffs need not "conclusively" demonstrate that options were backdated at TriQuint, nor must they demonstrate that the weight of the evidence favors them in any factual dispute with defendants. *Id.*

Defendants offer purported "innocent explanations" that some of the alleged option grants were not backdated at TriQuint but disputes such as these cannot be resolved on a summary judgment motion, much less on a motion to dismiss. *See Howley v. Town of Stratford*, 217 F.3d 141, 151 (2d Cir. 2000); *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1140 (9th Cir. 2003); *Space Systems/Loral, Inc. v. Lockheed Martin Corp.*, No. C96-03418 ST, 2006 WL 279331, at *7 (N.D. Cal. Feb. 6, 2006).[12]

### 1. Plaintiffs' Analysis Supports the Reasonable Inference that Options May Have Been Manipulated at TriQuint

As stated above, plaintiffs identified the eight option grants challenged in the Complaint as being likely to have been manipulated by employing two accepted analytical models for detecting

---

[12]    This legal principle is no doubt rooted in the simple logic that a defendant cannot win a Rule 23.1 motion based on his or her self-interested claim that they are innocent or that "they didn't do it." Indeed, if the Court could simply accept defendants' "innocence" claims at face value, it would be difficult to imagine how any plaintiff in any civil case could ever avoid dismissal on pleading grounds – as this Court is well aware, defendants do not often admit to wrongdoing. Defendants' suggestion here that this action cannot proceed beyond the pleading stage unless they admit misconduct is incredible. Moreover, the case law on point firmly demonstrates the obvious – mere claims of innocence in response to allegations of stock option backdating or manipulation will not support a dismissal. *See, e.g., Ryan*, 918 A.2d at 354-55; *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563 (Del. Ch. 2007); *Conrad*, 2007 WL 2593540, at *7.

backdated options – those employed by CFRA and Merrill Lynch.  *See supra* 7-8; ¶¶54-62.[13]  The

Merrill Lynch methodology has been accepted by Chancellors Chandler and Lamb, in *Ryan* and

*Conrad*, respectively.  *See Conrad*, 2007 WL 2593540, at \*8 n.30 (accepting plaintiff's application

of Merrill Lynch analysis); *Ryan*, 918 A.2d at 355 (acknowledging "empirical data" of Merrill

Lynch analysis).  The CFRA methodology has been accepted by Judge Alsup.  *CNET*, 483 F. Supp.

2d at 956-957.  And, in *Zoran*, Judge Alsup accepted an *ad hoc* methodology "not entirely revealed"

that found 7 of 32 grants fell on the date with the lowest closing price in the month.  *See Zoran*, 2007

U.S. Dist. LEXIS 43402, at \*28-\*29.

Defendants, however, mischaracterize the statistical model under which plaintiffs detected

grants likely to have been backdated at TriQuint ("plaintiffs have selectively chosen eight of at least

22 grants made . . . during the 1998-2002 time period, based on the plaintiffs' selective criteria that

the grant be made during an apparent low point in the Company's stock price").  TriQuint Mem. at

12.  In fact, a very similar model, which defendants seemingly endorse,[14] was used by the plaintiff in

---

[13]     Defendants argue that plaintiffs' analysis of stock option grants at TriQuint is "inconsistent" because, *inter alia*, plaintiffs cite to both 10- and 20-day periods of stock price movement prior to and following purported grant dates, and plaintiffs compare the applicable rates of returns for recipients of some, but not all, of the challenged grants with those of typical TriQuint shareholders. *See* TriQuint Mem. at 12-13.  First, plaintiffs need not allege all the data upon which they relied to identify alleged backdated grants.  Plaintiffs employed the same methods as CFRA and Merrill Lynch and alleged some of the suspicious facts concerning the grants.  Second, even if plaintiffs did not rely on the CFRA and Merrill methodologies**,** there is no one set, defined, authoritative methodology for detecting backdated stock option grants.  *See Computer Sciences*, 2007 WL 1321715, at \*14 ("the detailed statistical analysis that the plaintiffs employed in *Ryan* is not necessary to making particularized allegations of backdating").  As defendants themselves note, there are ***various*** widely accepted methodologies which have been utilized by courts, commentators and academics to detect ***potentially*** manipulated option grants at publicly traded corporations. TriQuint Mem. at 9, 12.

[14]     *See* TriQuint Mem. at 9-10.

*Ryan.*[15]  Such a model has been widely accepted by analysts and academics examining the option

backdating scandal that has swept the nation over the past year, as acknowledged by the Chancellor:

> The literature on the opportunistic timing of option grants – and the more recent
> literature on backdating – have focused on post- and pre-grant stock returns as their
> tool for detecting and investigating abnormal patterns in option grants.  In particular,
> to detect patterns that could be the result of backdating, this research examined
> whether post-grant returns tended to be positive, whether pre-grant returns tended to
> be negative, and whether post-grant returns tended to exceed pre-grant returns.  Post-
> and pre-grant returns have then been the tool used by this research to investigate the
> variables correlated with grant manipulation as well as to estimate the incidence of
> such manipulation.

*Ryan*, 918 A.2d at 360 n.60.  As discussed *supra* at 7-8, the grants specifically challenged by

plaintiffs in the action clearly fit this profile.  As demonstrated by the graphic illustrations of these

grants, pre-grant returns tended to be negative and post-grant returns tended to be positive.  ¶¶54-62.

Perhaps more importantly, however, as it relates to the instant Rule 23.1 motion, and despite

defendants' suggestions to the contrary (TriQuint Mem. at 2-3, 12) there is no requirement that

plaintiffs allege that ***every*** grant issued during the relevant period was manipulated in order to

support the reasonable inference that ***certain*** specific grants may have been so.  Nowhere does *Ryan*

state, or even suggest, that every single grant issued at a corporation needs to be challenged in order

for the Court to reasonably infer that certain option grants appear likely to have been manipulated.

*See Ryan*, 918 A.2d at 348.  In fact, if anything, *Ryan* suggests that empirical data can support the

challenge of any number of instances of backdating:

> I pause here to note the procedural posture of this case.  This opinion addresses a
> motion to dismiss.  Thus, neither party has had the benefit of any discovery.  At this
> stage, plaintiffs are afforded certain presumptions of truth.  Because of these

---

[15]    The *Ryan* plaintiff cited grants based upon annualized stock price returns at Maxim for the
20-day period subsequent to options pricing in comparison to stock price returns for the calendar
year in which options were granted.  *Ryan*, 918 A.2d at 346-47.

> presumptions, *plaintiff may survive a motion to dismiss where the complaint relies on empirical data to support claims of: (1) specific instances of backdating;* (2) violations of shareholder-approved plans or some other legal obligation; and (3) fraudulent disclosures regarding compliance with that plan.

*Id.* at 358 n.49.  Here 8 of 22 grants – over 35% of defendants' grants – are alleged to have been backdated.  Not only is it permissible for plaintiffs to allege 8 of 22 grants were backdated, the proportion of backdated grants is quite persuasive.  That defendants managed to beat the odds so often is not a coincidence.

Defendants also state plaintiffs have used the methodology "inconsistently" and that "return analysis refutes backdating."  TriQuint Mem. at 12-13.  That is incorrect.  First, plaintiffs replicated the methodologies of CFRA and Merrill Lynch.  There is nothing inconsistent about those models and as shown above, those methods have been accepted by courts.  In contrast, defendants have arbitrarily chosen certain facts in an attempt to exculpate themselves without mentioning what the results of a screen under CFRA would bear or the results of a complete Merrill Lynch analysis.  The so-called "return analysis" on a fraction of the alleged backdated grants referenced by TriQuint at pages 13-14 of its motion is homegrown.  In fact, TriQuint does not even purport to apply the "Perfect Payday" analysis of *The Wall Street Journal* it references at pages 12-13 of its motion.

Moreover, in support of its attempt to arbitrarily and improperly raise competing inferences, TriQuint cites three cases that have been criticized to the extent they do not follow *Ryan*: *In re CNET*, *In re Linear Tech. Corp.*, and *In re Openwave Sys. Inc.*  As Chancellor Lamb stated in *Conrad*:  "To the extent *CNET* and several other recent decisions of that court, *In re Linear Technology Corp. . . . In re Openwave Systems Inc.*, can be read as applying a substantially harsher standard than is applied in *Ryan* or in this decision, the court declines to follow them."  *Conrad*, 2007 WL 2593540, at *7.

Perhaps it is no wonder that defendants have relied on those criticized decisions and launched an arbitrary attack on plaintiffs' alleged backdated grants, without applying the published methodologies accepted by courts.  In fact defendants must know that the CFRA methodology identifies the grants plaintiffs have alleged are backdated at paragraphs 55-63 of the Complaint.  And the Merrill Lynch methodology accepted by Chancellors Chandler and Lamb does not bode well for defendants either.  *See* ¶¶55-63.  Indeed, the average annualized return of the backdated option grants during 1998-2002 was over 849%, more than *six times* the average annual return of public investors over the same period.

| Year | TriQuint Public Investor Returns | 20-Day Annualized Returns of Backdated Grants |
|---|---|---|
| 1998 | -4.9% | 99%, 1030% |
| 1999 | 778.3% | 527% |
| 2000 | 46.4% | 191% |
| 2001 | -68.5% | 3357%, 482% |
| 2002 | -66.7% | 259% |
| Average: | 136.9% | 849.3% |

## 2. Defendants' Remaining Challenges to Plaintiffs' Option Grant Analysis Are All Procedurally Improper

### a. Defendants Are Not Entitled to the Inferences They Seek on a Rule 23.1 Motion

Defendants discuss the grants challenged by plaintiffs and repeatedly ask this Court to draw inferences in their favor (*e.g.*, "If the defendants were inclined to backdate, as plaintiffs allege, one would think they would choose the lowest price."  TriQuint Mem. at 15.  "If the defendants were 'looking back' as the Complaint hints, one would assume they would look back to the $9.18 price." *Id*. at 17.  "It defies belief in the context of this Complaint, that officers or directors inclined to

CONSOLIDATED OPP TO MOTIONS TO DISMISS FILED BY DEFS & NOMINAL PARTY TRIQUINT SEMICONDUCTOR, INC.

Page 18

backdate would not have gone back one more day." *Id.*) [16] TriQuint's arguments here are improper, as all reasonable inferences must be resolved at the pleading stage, on a Rule 23.1 motion, in favor of the plaintiffs. *Gatz*, 925 A.2d at 1274-75; *White*, 783 A.2d at 549; *Zimmerman*, 2002 Del. Ch. LEXIS 145, at *27; *Ryan*, 918 A.2d at 357.[17]

### b.    The Court Should Not Accept Defendants' Self-Interested Conclusion that No Backdating Occurred

Defendants ask for all of the presumptions and protections of the "business judgment rule" with respect to TriQuint's management's conclusion that no option backdating occurred at the Company.  TriQuint Mem. at 7-8, 19-20.  However, as a matter of law, the Court cannot accept this "innocent" explanation as true because the business judgment rule only applies to decisions of ***disinterested directors***.  *See Aronson*, 473 A.2d at 812 (business judgment rule "protections can only be claimed by disinterested directors, from the standpoint of interest, this means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all

---

[16]    In any event, even if these requests for inferences in their favor were not procedurally improper on a Rule 23.1 motion, as noted in *CNET*, 483 F. Supp. 2d at 961, these arguments are substantively meritless, akin to "***giving a bank robber credit for leaving some cash in the vault***" and "that there were days close in time where the stock closed at an even lower price is not sufficient to defeat the facts pleaded by plaintiffs."

[17]    Although it is unclear, defendants seem to suggest that *CNET* should persuade this Court's analysis of the demand futility issues here.  *CNET*, 483 F. Supp. 2d at 947.  Plaintiffs, however, respectfully submit that the Rule 23.1 demand futility analysis in *CNET* was fatally flawed.  For example, the Court merely surmised that CNET's compensation committee members "***may not*** have known the date on which all actions had been completed for the grants to be made" and "***may not*** know the exact date on which a grant was finalized because the committee delegated that authority." *Id.* at 965.  In addition, the *CNET* court weighed the plaintiffs' empirical data regarding each of the challenged option grants against the defendants' various "innocent" explanations. *Id.* at 959-62.  In sum, the *CNET* court did not conduct the limited, circumscribed inquiry required on a Rule 23.1 motion.  *CNET* has been criticized for this.  *Conrad*, 2007 WL 2593540, at *7 n.22.

stockholders generally"); *McMullin v. Beran*, 765 A.2d 910, 923 (Del. 2000) (holding that the "substantive protections of the business judgment rule can be claimed only by disinterested directors").[18]

Here, TriQuint's secret "management" investigatory committee undeniably seeks the protections of the business judgment rule.  Notwithstanding the fact that defendants have not disclosed who, exactly, conducted the Company's internal investigation, it is clear that if any alleged recipients of backdated option grants (or those who awarded them) investigated their own conduct, such individuals are obviously not entitled to the presumption of propriety because they are not disinterested.  *See Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 64 (Del. 1989) (citing *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)) (any protections afforded by the business judgment rule are negated by allegations of "self interest").  This is particularly the case if any TriQuint **officers** investigated their own conduct, because it is black-letter law that the protections afforded by the rule are only extended to disinterested directors, **not officers**.  *Aronson*, 473 A.2d at 812; *McMullin*, 765 A.2d at 923; *Platt v. Richardson*, No. 88-0144, 1989 WL 159584, at *2 (M.D. Pa. June 6, 1989) (applying Delaware law and noting that "[t]he Delaware business judgment rule . . . applies only to directors . . . and not to officers").

And the conclusion of the investigation by management (including those who received allegedly backdated options) is simply a gross denial that backdating occurred.  There is no explanation whatsoever.  Offering this sort of assertion in place of a well-pleaded complaint was recently criticized by Chancellor Lamb in *Conrad*:

---

[18]     *See also* 1 David A. Drexler, *et al.*, *Delaware Corporation Law and Practice*, §15.05[1], at 15-11 (1999) (indicating that where classic self-interest exists, the "business judgment rule automatically falls by the wayside").

[T]he "findings" of the review conducted by the company and the audit committee, other than the grossest generalities, have been carefully hidden from both the stockholders and the court. There can also be no suggestion that either the company or the members of the audit committee were unaware that the company had potential claims for relief, such as those asserted in this complaint, when they conducted their review.

*Conrad*, 2007 WL 2593540, at *7.

### c. This Court May Not Weigh Evidence on a Rule 23.1 Motion

Defendants' entire argument is nothing more than a thinly veiled attempt to convert its Rule 23.1 motion to dismiss into a "mini-trial" on the pleadings. This is never more apparent than when defendants admittedly introduce their own "***evidence***" and innocent explanations regarding certain grants challenged by the plaintiffs and impermissibly ask the Court to: (a) weigh such "evidence" and innocent explanations against plaintiffs' empirical data, and (b) conclude on that basis at the pleading stage that backdating did not occur at TriQuint (*e.g.*, "in the two instances in which the yearly returns were significantly better for the grants at issue – December 2, 1998 and April 4, 2001 – ***there is contemporaneous evidence supporting the conclusion that the grants occurred on those dates***" (TriQuint Mem. at 15); "the December 2, 1998 grant was made on the date of a regularly scheduled TriQuint Board meeting" (*id.*); "the April 4, 2001 grant also was made on the date of a Board meeting, and the meeting was disclosed in a public filing unrelated to the granting of stock options" (*id.*); and "***this contradicts plaintiffs' theory*** that TriQuint fabricated the April 4 grant date after the fact" (*id.*)).

Defendants may wish that this Court could "weigh the evidence" under a "preponderance of the evidence" standard on the instant Rule 23.1 motion, but this is simply not the case under Delaware law. ***This can only occur at trial***, as the Chancellor makes clear in *Ryan*:

I pause here to note the procedural posture of this case. This opinion addresses a motion to dismiss. Thus, neither party has had the benefit of any

discovery.   At this stage, plaintiffs are afforded certain presumptions of truth. Because of these presumptions, plaintiff may survive a motion to dismiss where the complaint relies on empirical data to support claims of: (1) specific instances of backdating; (2) violations of shareholder-approved plans or some other legal obligation; and (3) fraudulent disclosures regarding compliance with that plan. If, however, this case reaches the trial stage, plaintiff may no longer rely on liberal pleading assumptions.  Instead, plaintiff must then rely on evidence presented at trial to demonstrate by a preponderance of the evidence that the defendants in fact backdated options . . . .

*Ryan*, 918 A.2d at 358 n.49.

The instant action has not yet reached the trial stage, just as the case in *Ryan* had not. Plaintiffs here are entitled to the very same "liberal pleading assumptions" that the plaintiff in *Ryan* was afforded on a Rule 23.1 motion.  Accordingly, the Court cannot and should not "weigh the evidence" and conduct a mini-trial on the pleadings, regardless of defendants' wishes.

For the foregoing reasons, this Court should limit its Rule 23.1 inquiry into whether the allegations set forth in plaintiffs' Complaint, ***standing alone***, support a reasonable inference that option grants may have been manipulated at TriQuint.[19]  Plaintiffs respectfully submit that they satisfy this test.

---

[19]    Defendants, in support of their efforts to have this Court "weigh the evidence" and conduct a mini-trial on the pleadings, cite various recent decisions which they submit control the instant Rule 23.1 analysis.  TriQuint Mem. at 9-11.  One of these is *CNET*, 483 F. Supp. 2d at 947.  Another is *In re Openwave Sys. Inc. S'holder Derivative Litig.*, No. C06-03468 SI, 2007 WL 1456039 (N.D. Cal. May 17, 2007), where, as defendants themselves describe, in connection with their Rule 23.1 motion, the defendants "presented ***evidence*** that the option grants named in the complaint had a high statistical probability of actually having been granted on those dates."  TriQuint Mem. at 11; *see Openwave*, 2007 WL 1456039, at *7.  As such, *Openwave* should not persuade this Court in reaching its Rule 23.1 holding.  Both of these cases have been criticized.  *See Conrad*, 2007 WL 2593540, at *7 n.22

### 3.    Defendants Sharp and Kauser Received Backdated Options, Rendering Them Interested

Plaintiffs allege that defendants Sharp and Kauser were the recipients of backdated TriQuint stock option grants during the relevant period. ¶¶50, 54-62. Because Sharp and Kauser received direct, illicit financial benefits which were not shared with TriQuint shareholders, they cannot be expected to exercise independent business judgment without being influenced by the adverse personal consequences resulting from the decision, and are therefore directly "interested" in a demand under the first prong of the *Aronson* test. *See Aronson*, 473 A.2d at 812. In the backdating context, federal courts have consistently ruled that when plaintiffs "plead with particularity that the directors received backdated grants, those directors will be considered interested." *Zoran*, 2007 U.S. Dist. LEXIS 43402, at *26; *CNET*, 483 F. Supp. 2d at 958. This is because "'directors receiving backdated stock options' receive a benefit not shared by stockholders," as "shareholders do not have the benefit of reaching back in time to buy their shares at low-price point[s]." *Zoran*, 2007 U.S. Dist. LEXIS 43402, at *25.

Plaintiffs plead with specificity that Sharp and Kauser each received backdated options. For example, the Complaint alleges that Sharp received: (i) 28,750 backdated options on December 2, 1998; (ii) 40,000 backdated options on December 1, 1999; (iii) 120,000 backdated options on December 21, 2000; (iv) 20,000 backdated options on December 21, 2001; and (v) 20,000 backdated options on April 29, 2002. ¶¶50, 54-62.[20] Similarly, the Complaint alleges that Kauser received

---

[20]    Plaintiffs' empirical analysis strongly supports the reasonable inference that the grants which defendant Sharp accepted were manipulated. For example, defendant Sharp was purportedly awarded 40,000 options on December 1, 1999, at an exercise price of $84.50. ¶50. Twenty trading days later, TriQuint stock closed with a price of $109.25 per share, for a cumulative 20-day trading return of over 29%. ¶58. Stated another way, the total grant value to Sharp at the date of this grant was $3,380,000, while the total grant value ***only 20 trading days later was almost $1 million higher,***

22,500 backdated options on December 1, 1999.[21]  *Id.*  Thus, just as in *Ryan*, *Zoran* and *Computer Sciences*, the directors here who received backdated options (Sharp and Kauser) are directly interested for demand futility purposes.  Accordingly, demand upon defendants Sharp and Kauser was not required.

> ### 4.    Gibson, Rhines, Gary and Kauser Awarded Backdated Options, Which Was Not a Legitimate Exercise of Business Judgment

As stated by Chancellor Chandler in *Ryan*, there is a "reason to doubt" that those directors who served as members of TriQuint's Compensation Committee during the relevant period – Gibson, Rhines, Gary and Kauser – engaged in transactions that were a valid exercise of business judgment.  *Ryan* and *Conrad* make clear that the award or administration of backdated option grants and/or approval of the dissemination of false and misleading statements regarding option grants cannot be a legitimate exercise of business judgment.  *See Ryan*, 918 A.2d at 354-56; *Conrad*, 2007 WL 2593540, at *7-*9.

---

*or $4,370,000*.  Similarly, defendant Sharp purportedly received 120,000 options on December 21, 2000, carrying an exercise price of $36.50 per share.  ¶50.  Twenty trading days later, TriQuint stock closed with a price of $40.38, for a cumulative 20-day return of nearly 11%.  ¶59.  Stated another way, the total value of the date of the grant to Sharp was $4,380,000 while the total value of this grant *only 20 trading days later was nearly half a million dollars higher, or $4,845,600*.  Any stockbroker would be proud of such prodigious returns after only 20 trading days.

[21]    Here, defendant Kauser was purportedly awarded 22,500 options on December 1, 1999 carrying an exercise price of $84.50 per share.  ¶50.  Twenty trading days later, TriQuint stock closed with a price of $109.25 per share, for a cumulative 20-day trading return of over 29%.  ¶58.  Stated another way, the total grant value to Kauser at the date of this grant was $1,901,250, while the total grant value *just 20 trading days later was well over half a million dollars higher, or $2,458,125.*  Again, these are the sorts of returns that any market participant or shareholder would be thrilled with.

During the relevant period, Gibson, Rhines, Gary and Kauser each served at various points as members of the Compensation Committee and awarded some or all of the grants specifically challenged in this action.  ¶¶50, 54-62, 108.  The  Compensation Committee was charged with specific authority over the Company's various Stock Option Programs, by the express terms of those programs themselves.  ¶50.  The programs **required**, *inter alia*, that strike prices be "***not less than 100% of the fair market value per share on the date of grant***."  *Id*.[22]  Plaintiffs have specifically identified option grants awarded by the Compensation Committee during the relevant period which are alleged to have been backdated and specific (purported) dates of those awards.  ¶¶54-62.[23]

Plaintiffs have alleged facts with respect to the Compensation Committee's option-granting responsibilities which are virtually identical to those alleged in *Ryan.*  There, Maxim's compensation

---

[22]     This representation was no mere "goal" or an "aspiration."  Rather, this was a material term of a contract entered into with TriQuint shareholders, whose approval of the Stock Option Programs was sought (and obtained) through representations set forth in the Company's annual proxy statements.  *See Ryan*, 918 A.2d at 355-56.  Defendants misrepresented to TriQuint shareholders the terms under which options would actually be granted under the programs.  ¶¶49-50, 70(b), 73(b)-(c), 76(b), 79(b)-(c), 82(b)-(c), 85(b)-(c), 88(b)-(c), 91(b)-(c).  It is well settled that directors are under a fiduciary duty to make accurate and fair representations when they seek shareholder action.  *Arnold v. Soc'y for Sav. Bancorp.*, 650 A.2d 1270, 1277 (Del. 1994); *see also Ryan*, 918 A.2d at 358 ("false disclosures, obviously intended to mislead shareholders into thinking that the directors complied honestly with the shareholder-approved option plan, is . . . an act of bad faith").  This obligation attaches to proxy statements and any other disclosures made in contemplation of stockholder action.  *Arnold*, 650 A.2d at 1277 (citing *Stroud v. Grace*, 606 A.2d 75, 85 (Del. 1992)).

[23]     Plaintiffs have also specifically identified statements repeatedly issued by Gibson, Rhines, Gary, and Kauser (among others) in Company financial filings, including annual proxy statements, which sought stockholder approval of the Stock Option Programs, where they misrepresented, *inter alia*, that the exercise price of Company stock options granted was established based on the fair market value of Company stock on the date of the grant.  Plaintiffs further allege specific instances where Gibson, Rhines, Gary, and Kauser (among others) caused the Company to file and disseminate (and in many cases, personally signed) materially misleading financial statements during the relevant period, which, as a direct result of the option scheme, materially overstated the Company's profits.  ¶¶100, 111-36.

committee was charged with the administration of Maxim's stock option plans, which **required** that "'[t]he exercise price of each option shall not be less than one hundred percent (100%) of the fair market value of the stock subject to the option on the date the option is granted.'" *Ryan*, 918 A.2d at 354.[24] The plaintiff identified specific grants alleged to have been backdated, whose timing, like the grants administered by the Compensation Committee here, "seems too fortuitous to be mere coincidence." *Ryan*, 918 A.2d at 355.[25] The plaintiff identified false and misleading public disclosures by Maxim's compensation committee members, as plaintiffs have here, regarding the terms of Maxim's stock option plans, and the dates and terms of options granted thereunder.[26] *Ryan*, 918 A.2d at 355.

Recognizing that Maxim's stock option plans "*do not grant the board discretion to alter the exercise price by falsifying the date on which options were granted*" (*id.*), and that Maxim's board of directors (including its compensation committee) had made "*intentionally fraudulent public disclosures*" (*id.*), the Chancellor held that demand was excused under the second prong of *Aronson*. *Id.* at 354 ("the unusual facts alleged raise a reason to doubt that the challenged transactions resulted from a valid exercise of business judgment"). The Court should reach the same conclusion here.

---

[24]    As discussed above, TriQuint's Stock Option Programs required that strike prices be "not less than 100% of the fair market value per share on the date of grant." ¶50.

[25]    ¶¶54-62; *see also supra* at §§II, III.B.1.

[26]    *See*, *e.g.*, ¶76(b) ("'[S]tock options under this Program are generally granted at an exercise price equaling 100% of fair market value. . . . Because the receipt of value by an executive officer under a stock option is dependent upon an increase in the price of the Company's Common Stock, this portion of the executives' compensation is directly aligned with an increase in stockholder value.'").

Contrary to defendants' assertions (Defs' Mem. at 19-20), the particularized allegations set forth in the Complaint which detail the backdated option grants awarded and false disclosures issued by defendants Gibson, Rhines, Gary, and Kauser are sufficient to demonstrate their inference of knowledge for pleading purposes under Rule 23.1.  As the Chancellor held in *Ryan* when facing a similar argument from the defendants there:

> Defendants also object that Plaintiff's allegations are not particularized for purposes of Rule 23.1 because they do not directly allege knowledge on behalf of the directors.  Yet, ***it is difficult to understand how a plaintiff can allege that directors backdated options without simultaneously alleging that such directors knew that the options were being backdated.  After all, any grant of options had to have been approved by the [compensation] committee, and that [compensation] committee can be reasonably expected to know the date of the options as well as the date on which they actually approve a grant***.

*Ryan*, 918 A.2d at 355 n.35.  *See also Tyson*, 919 A.2d 563, 592 (Del. 2007) ("[a]t their heart, all backdated options involve a fundamental, incontrovertible lie: directors who approve an option dissemble as to the date on which the grant was actually made"); *CNET*, 483 F. Supp. 2d at 956 ("[t]he [option grant] measurement date cannot occur until the options are approved by those with authority to do so").

Accordingly, demand is excused because defendants Gibson, Rhines, Gary, and Kauser have acted in bad faith and have entered into transactions which are not protected by the business judgment rule.  Taken together with defendant Sharp, who is directly interested in a demand[27] based upon his receipt of backdated options during the relevant period, demand was not required with respect to ***at least*** five out of the seven members of TriQuint's Board.  As such, demand is excused.

---

[27]     As discussed above, defendant Kauser is also directly interested in a demand based upon his receipt of backdated stock options.

5.    **Gibson, Rhines, Gary, and Kauser Also Face a Substantial Likelihood of Liability, Excusing Demand**

As noted *supra* at §III.A, a director is also considered "interested" when he faces a substantial likelihood of liability resulting from his conduct on the Board.  Clearly, as acknowledged by the Chancellor in *Ryan*, 918 A.2d at 353-56, Gibson, Rhines, Gary, and Kauser, as members of the Compensation Committee during the relevant period, face a substantial likelihood of liability due to their participation in the TriQuint backdating scheme, rendering them interested in any demand. *See also Computer Sciences*, 2007 WL 1321715, at *15 (holding that a complaint "raises a reasonable doubt as to the interestedness of directors [who] . . . served on the committee that controlled [the] timing, pricing, and approval" of backdated stock option grants).

After holding that "knowing and intentional violations of the stock option plans . . . cannot be an exercise of business judgment" under the second prong of the *Aronson* test, Chancellor Chandler also analyzed whether Maxim's compensation committee members (and indeed, ***all*** of the Maxim directors) were "interested" for demand futility purposes pursuant to a substantial likelihood of liability/interestedness analysis under *Rales*. *Ryan*, 918 A.2d at 355-56.  Taking into account that, similar to the instant action, three of Maxim's board members had served on the compensation committee and had awarded backdated option grants, and that another Maxim director had been the beneficiary of backdated options, the Court opined that:

> *A director who approves the backdating of options faces at the very least a substantial likelihood of liability, if only because it is difficult to conceive of a context in which a director may simultaneously lie to his shareholders (regarding his violations of a shareholder-approved plan, no less) and yet satisfy his duty of loyalty. . . . Plaintiff alleges that three members of a board approved backdated options, and another board member accepted them.   These are sufficient allegations to raise a reason to doubt the disinterestedness of the current board and to suggest that they are incapable of impartially considering demand.*

*Id.; see also Tyson*, 919 A.2d at 593 (finding that directors faced a substantial likelihood of liability for manipulated stock option grants because "[a] director who intentionally uses inside knowledge not available to shareholders in order to enrich employees while avoiding shareholder-imposed requirements cannot, in my opinion, be said to be acting loyally and in good faith as a fiduciary").

Contrary to defendants' repeated claims that *Ryan* is inapplicable to the instant action, ***Ryan's rationale is directly on point.*** In the instant action, two directors – Sharp and Kauser – are directly "interested" based upon their receipt of backdated options, discussed *supra* at §III.B.3; ¶¶50, 54-62, 108. Moreover, similar to *Ryan*, four Compensation Committee members – Gibson, Rhines, Gary, and Kauser – are undoubtedly "interested" as well, because they approved and administered backdated options, and then issued false and misleading statements to cover-up the scheme. ¶¶28-31, 69-98. This clear breach of their duty of loyalty exposes them to a substantial likelihood of liability, excusing demand. *See Ryan*, 918 A.2d at 358. ("***I am convinced that the intentional violation of a shareholder approved stock option plan, coupled with fraudulent disclosures regarding the directors' purported compliance with that plan, constitute conduct that is disloyal to the corporation and is therefore an act in bad faith***."); *see also Tyson*, 919 A.2d at 592 ("A director's duty of loyalty includes the duty to deal fairly and honestly with the shareholders for whom he is a fiduciary. It is inconsistent with such a duty for a board of directors to ask for shareholder approval of an incentive stock option plan and then later to distribute shares . . . in such a way as to undermine the very objectives approved by shareholders.").

### 6. Defendants Concede that Quinsey and Sharp Are Not Independent

Moreover, there is reason to doubt the independence of Quinsey and Sharp, as defendants have already conceded that Quinsey and Sharp lack independence in TriQuint's public filings. For

CONSOLIDATED OPP TO MOTIONS TO DISMISS FILED BY DEFS &
NOMINAL PARTY TRIQUINT SEMICONDUCTOR, INC.

Page 29

example, in TriQuint's most recent annual proxy statement filed with the SEC and disseminated to shareholders on April 20, 2007, defendants stated that:

> TriQuint has adopted standards for director independence, which are compliant with the rules of the NASDAQ Global Market. ***Each member of the board and the board committees, except for Mr. Quinsey and Mr. Sharp, meet the aforementioned independence standards. Mr. Quinsey does not meet the aforementioned independence standards, because he is the current president, chief executive officer and an employee of TriQuint***. Mr. Quinsey does not sit on any board committee. Mr. Sharp, our former president and chief executive officer, was an employee of TriQuint until 2004. As a result, Mr. Sharp is not independent pursuant to the rules of the NASDAQ Global Market. Mr. Sharp does not serve on any board committee.

Ex. 1 at 14.

As defendants plainly recognize, Delaware courts have repeatedly held that employee-directors of a corporation who depend on their positions for their livelihood cannot be considered independent of directors who are their employers and/or management superiors. *See, e.g.*, *Rales*, 634 A.2d at 937 ("there is a reasonable doubt that [an employee-director] can be expected to act independently considering his substantial financial stake in maintaining his current offices"); *In re Cooper Cos., Inc. S'holders Derivative Litig.*, No. 12584, 2000 Del. Ch. LEXIS 158, at *19-*20 (Del. Ch. Oct. 31, 2000) (finding allegations that employee-directors "owed their positions and their livelihood to maintaining the good will" of other directors "creates reason to doubt that [employee-directors] could have responded impartially to a demand").[28] Accordingly, demand was not required upon Quinsey and Sharp.

---

[28] *Accord Mizel v. Connelly*, No. 16638, 1999 Del. Ch. LEXIS 157, at *9 (Del. Ch. July 22, 1999) (since employee directors "each derive their principal income from their employment at President Casinos, it is doubtful that they can consider the demand on its merits without also pondering whether an affirmative vote would endanger their continued employment"); *In re Ply Gem Indus., S'holders Litig.*, No. 15779-NC, 2001 Del. Ch. LEXIS 84, at *28-*29 (Del. Ch. June 26, 2001) (finding that officers of corporation were not independent of Chairman of the Board and CEO,

### C.     Plaintiffs' Allegations Satisfy *Aronson* and Thus Rebut the Business Judgment Rule

As shown herein, plaintiffs' allegations – taken as true – demonstrate that defendants' misconduct was not the product of valid business judgment.  TriQuint asserts plaintiffs "have not stated a claim for beach of either duty" of loyalty or care.  Defs' Mem. at 16.  But this is little more than a variant on their argument that demand was required.  Defendants also herald the "Complaint does not allege self-dealing" against Compensation Committee members because "[n]o Compensation Committee members are alleged to have granted themselves backdated stock option grants at the time they served on the Compensation Committee."  Defs' Mem. at 17-18.  But the Complaint need not allege self dealing to aver breach of the duty of loyalty or due care.

Under Delaware law, the business judgment rule only applies to directors who are independent, disinterested and well informed.  *Aronson*, 473 A.2d at 812-13.  *See also Citron*, 569 A.2d at 64 (citing *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  "Thus, where plaintiff alleges particularized facts sufficient to prove demand futility under the second prong of *Aronson*, that plaintiff a *fortiori* rebuts the business judgment rule for the purpose of surviving a motion to dismiss pursuant to Rule 12(b)(6)."  *Ryan*, 918 A.2d at 357.  *See also Computer Scis. Derivative Litig.*, No. 06-5288 MRP, 2007 U.S. Dist. LEXIS 25414, at *13 (C.D. Cal. Mar. 27. 2007).  As demonstrated herein, plaintiffs satisfy *Aronson*.  *See supra* §III.A-B.  A *fortiori* plaintiffs rebut the business judgment rule.

---

who could exercise "'considerable influence'" over them); *Cooper Cos.*, 2000 Del. Ch. LEXIS 158, at *19-*20 (officers of corporation were not independent of Co-Chairman of the Board, who was in a position to exercise "'considerable influence'" over them); *Steiner v. Meyerson*, No. 13139, 1995 Del. Ch. LEXIS 95, at *28-*30 (Del. Ch. July 18, 1995) (President and COO of corporation was not independent of Chairman of the Board, who was in a position to "'exert considerable influence'" over him).

"Even if this were not the case, the complaint here alleges bad faith and, therefore, a breach of the duty of loyalty sufficient to rebut the business judgment rule and survive a motion to dismiss." *Ryan*, 918 A.2d at 357.  As demonstrated herein, at least a majority of TriQuint's directors lacked disinterest and independence and engaged in conduct disloyal to the Company and its shareholders. *Id*. at 358 ("I am unable to fathom a situation where the deliberate violation of a shareholder approved stock option plan and false disclosures, obviously intended to mislead shareholders . . . is anything but an act of bad faith. . . .  Well-pleaded allegations of such conduct are sufficient, in my opinion, to rebut the business judgment rule . . . .").  *See also Zoran*, 2007 U.S. Dist. LEXIS 43402, at *68-*72.

### D.    "Exculpatory Provisions" in TriQuint's Certificate of Incorporation Do *Not* Support Dismissal Here

Contrary to what TriQuint states at pages 16 and 19 of its memorandum, plaintiffs cannot be dismissed at the pleading stage under the "exculpatory provision" of TriQuint's bylaws.  This argument should be treated as an affirmative defense not suitable at the pleading stage.  *Emerald Partners v. Berlin*, 726 A.2d 1215, 1223 (Del. 1999) (use of exculpatory provisions to shield directors from personal liabilities presents an affirmative defense, not amenable for pre-trial disposition); *In re Tower Air, Inc*., 416 F.3d 229, 242 (3d Cir. 2005) (same).  Assuming, *arguendo,* TriQuint properly raises this defense here (it does not), defendants concede that acts must be committed in "good faith" for the exculpatory provision to apply.  Defs' Mem. at 17.  Plaintiffs' averments clearly demonstrate this is not a matter of acts committed in "good faith."  *See supra* §II.

In *Zoran*, Judge Alsup held that given that the compensation committee "had the sole authority to decide option-grant dates and to ensure that options were being granted at fair market value on the date of the grant," it "is a reasonable inference at the pleading stage" that those directors acted in bad faith, and exculpatory provisions of the company's charter will not immunize the

defendants. *Zoran*, 2007 U.S. Dist. LEXIS 43402, at *68-*72.  Plaintiffs allegations here are similar if not identical.  *See* ¶¶49-50, 52-53.

### E.    The Miscellaneous Attacks on Plaintiffs' Fiduciary Duty- and Equity-Based Claims Lack Merit

As shown herein, defendants are not entitled to dismiss plaintiffs' well-pleaded allegations on the basis of the business judgment presumption.  *See supra* §III.C.

#### 1.    Insider Trading

Defendants assert plaintiffs fail to properly aver the essential elements of an insider trading claim.  Defs' Mem. at 19-20.  All of defendants' sales within the period alleged were on the basis of adverse material non-public information:  the Company's backdating practices.  The dates and proceeds from the sales are alleged.  ¶101.  That is sufficient.  Knowledge has also been properly alleged because defendants approved and/or received backdated options.  *See supra* §§III.A-B.

As defendants concede, Delaware recognizes claims for insider trading.  Defs' Mem. at 20.  Judge Alsup in *Zoran* held that that plaintiff "successfully pled that the insider-selling defendants possessed material, nonpublic information" and sold their stock knowing such information, given allegations showing they "knew the stock options were backdated." *Zoran*, 2007 U.S. Dist. LEXIS 43402, at *71-*72.  Here, similar to *Zoran*, plaintiffs have sufficiently pleaded that defendants against whom these claims are brought had knowledge of TriQuint's backdating violations (indeed engaged in such violations and/or received backdated options) when they sold their TriQuint stock.

#### 2.    Corporate Waste and Unjust Enrichment

Defendants extensively declare claims for corporate waste have a "high" standard in their memorandum.  Defs' Mem. at 21.  But nowhere do they explain (for they cannot) how the factual allegations in this case somehow do not amount to corporate waste.  Defendants quote the summary allegation of plaintiffs' claim at paragraph 183 of the Complaint and assert it fails for its "conclusory

fashion" (Defs' Mem. at 21), but they ignore all the facts of the Complaint that were reasserted and incorporated by reference in support of the claim.

Backdated stock option grants, by their nature, were granted "in-the-money." Defendants never gave any consideration for the money they diverted to themselves and others by backdating. Moreover, nobody could reasonably conclude any adequate consideration could be given for causing TriQuint (or any company) to engage in conduct prohibited by regulatory and criminal penalties. As Judge Alsup stated in *Zoran*:

> Backdating is a form of fraud. In the face of such allegations, defendants simply cannot be said to have acted in the company's best interest. Accordingly, plaintiff has pled a claim for corporate waste under Delaware law.

2007 U.S. Dist. LEXIS 43402, at *75. This case is pleaded no differently than *Zoran* insofar as it alleges backdating. It is no wonder that defendants fail to explain what facts are missing or otherwise insufficiently pleaded in their request that our claim for corporate waste be dismissed. Where, as here, claims of backdating are properly averred, the claim for corporate waste should stand at the pleading stage.

For the same reasons, defendants' conduct was unjustified and subjects them to liability for unjust enrichment. Defendants do not (and cannot) dispute they were enriched by the receipt of backdated ("in-the-money") stock options. To the extent there is no legal remedy for such excessive compensation, a claim for unjust enrichment should lie.

### 3.    Gross Mismanagement and Abuse of Control

As with plaintiffs' claims for corporate waste, nowhere do defendants explain (for they cannot) how the factual allegations in this case somehow do not amount to gross mismanagement and abuse of control. Again, defendants quote the summary allegation of plaintiffs' count at paragraphs 175-176 of the Complaint and assert those paragraphs contain "boilerplate allegations"

(Defs' Mem. at 22), but they ignore all the facts of the Complaint that were reasserted and incorporated by reference in support of the claim. Defendants also suggest that the pleadings fail to properly aver they acted ""outside the bounds of reason'"" to support these claims. *Id.* The factual allegations of the Complaint plead that defendants granted and/or received backdated options and then concealed from the shareholders that practice. *See supra* §§II, III.A-B, IV.B; ¶¶49-98. It is irrational for defendants to suggest such conduct is anything less than acting outside the bounds of reason.

### 4.    Accounting and Rescission

Defendants largely concede plaintiffs may assert these claims if the Complaint states a claim for backdating. Defs' Mem. at 22. According to the Delaware Chancery Court, "[a]n accounting will lie" where "a fiduciary relationship exists between the parties and a duty to account rests upon the defendant." *Hendry v. Hendry*, No. 12236, 2006 Del. Ch. LEXIS 99, at *40-*41 (Del. Ch. May 30, 2006). As shown herein, defendants violated their fiduciary duty to TriQuint's shareholders, therefore, plaintiffs properly assert a claim for accounting and rescission.

### F.    Plaintiffs Have Standing to Bring this Action

Defendants assert standing is not pleaded because neither plaintiff has "specifically allege[d] it held TriQuint stock on each" backdated option date. TriQuint Mem. at 22-23. Each plaintiff asserts he or she is now "and at times relevant was, a shareholder of nominal party TriQuint." ¶¶17-18. That is sufficient. As Judge Selna stated in *First American*:

> Shareholders have adequately pled stock ownership for purposes of Rule 23.1. Shareholders aver that they "are owners of First American stock and were owners of First American stock during times relevant to Defendants' illegal and wrongful course of conduct alleged herein." (Compl. ¶158.) ***It is unnecessary for Shareholders to plead specific dates of stock ownership in order to comply with Rule 23.1.*** *See Galdi v. Jones*, 141 F.2d 984, 992 (2d Cir. 1944) (holding that an allegation of stock ownership following the precise language of the federal rule was sufficient to survive a motion to dismiss, and further stating that "[i]f defendants

> wish to obtain a more definite statement – which, should it, by particularizing, show a substantial noncompliance . . . they can do so under Rule 12(e) or, preferably, by interrogatories, deposition or discovery"); 7C Charles Alan Wright, Arthur Miller, & Mary Kay Kane, *Federal Practice and Procedure; Civil* §1828 at 69 (3d ed. 2007) (rule 23.1 "simply provides that contemporaneous ownership be alleged").

*In re First American Corp. S'holder Derivative Litig*., No. SACV 06-01230 JVS (RNBx), Minute Order (C.D. Cal. Sept. 20, 2007) (Ex. 2) at 2. Ms. Belova has held her stock continuously since April 2000 and Mr. Bullard has held his stock in TriQuint continuously since January 1999. Exs. 3-4 (Bullard and Belova declarations). This 8-1/2 year period of ownership includes six of eight of the alleged backdated grants. There is no reasonable justification to preclude this action because two backdated option grants were accomplished a matter of months prior to Mr. Bullard's purchase of TriQuint stock or even to preclude claims specifically relating to the first two alleged backdated grants at this stage of the proceedings.

Under Delaware law, standing "'should be liberally construed in situations where its primary purpose will not be frustrated thereby,' so as not to 'prevent reasonable opportunities to rectify corporate aberrations.'" *Conrad*, 2007 WL 2593540, at *10. Concluding that plaintiffs "lack standing to challenge aspects of the alleged scheme that predate [their] ownership will deprive the stockholders of any 'reasonable opportunity to rectify' the corporate aberrations alleged to have taken place before [they] bought shares." *Id.* This concern is amplified given that the Company (including its wrongdoers) has purportedly investigated defendants' stock option granting practices and has refused to admit to wrongdoing or effect any substantive remedial measure. *See id.* In *Conrad* the plaintiff did not own stock during 7 of 12 of the alleged backdated grants, but the Court dismissed claims based on pre-ownership grants only conditioned on "receipt of further information from the parties about the possibility of some other stockholder intervening to assert those early claims, or the adoption of some other measure to preserve those claims in the event that they prove

to be of value to" the company. *Id.* Here if the Court dismisses claims specifically arising out of the two grants in 1998 (it should not), plaintiffs respectfully request dismissal of those claims be conditional as in *Conrad.*

## IV. Plaintiffs Adequately Plead Federal Securities Law Violations

### A. Legal Standards for a Motion to Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In considering the sufficiency of a securities fraud complaint under Rule 12(b)(6), the court must accept plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003). On a Rule 12(b)(6) motion, a plaintiff's allegations must be taken as true and read in their "entirety." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, __ U.S. __, 127 S. Ct. 2499, 2509, 2511 (2007). A court should not weigh facts or accept innocent explanations for the defendants' alleged violations at the pleading stage. *Am. West*, 320 F.3d at 931. Applying these standards, only "extraordinary" circumstances warrant dismissal under Rule 12(b)(6). *United States v. Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981).

Here, as demonstrated below, the Complaint states actionable claims for relief arising under §§10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

### B. Plaintiffs Sufficiently Aver Claims Under §14(a) of the Exchange Act

As former SEC Chairman Harvey Pitt has stated, backdating "likely renders a company's proxy materials false and misleading." ¶7. Defendants do not dispute that to plead §14(a) liability, plaintiffs need only allege that "'(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation [rather than the

particular defect in the solicitation materials], was an "essential link in the accomplishment of the transaction.'"" *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 682 (9th Cir. 2005). *See also* Defs' Mem. at 13. Furthermore, in *Knollenberg*, the Ninth Circuit confirmed that "Section 14(a) 'lacks any reference to . . . indicate a requirement of scienter.' Accordingly, negligence is sufficient to support a claim for a violation of Section 14(a)." *Id.* at 682-83.

Indeed, liability under §14 "is virtually absolute, as under Section 11 of the 1933 Act with respect to a registration statement." Richard W. Jennings & Harold Marsh, Jr., *Securities Regulation: Cases and Materials* 1358 (3d ed. 1972). Defendants' arguments that plaintiffs fail to plead the required elements of a §14(a) claim demonstrably lack merit. Defs' Mem. at 13-14.

***First,*** defendants largely concede plaintiffs allege falsity. Their argument that plaintiffs have not alleged falsity "wholly depends on the adequacy of plaintiffs' backdating allegations." *See* Defs' Mem. at 14. Defendants go on to assert that we "generically allege" who was "responsible" for the Proxy Statements. *Id.* What is generic is defendants' argument. Over 20 pages of the Complaint detail the false statements in TriQuint's Proxies, who was responsible for each Proxy, and the express recommendations that each director defendant made. *See* ¶¶66-98. Plaintiffs quote and paraphrase the specific false representations in each Proxy. *See id.* For example, as to the 1997 Proxy, the Complaint states: "The 1997 Proxy Statement was signed by Sharp and Winn and reviewed and approved by Sharp, Winn, Gary, Gibson and Rhines. The 1997 Proxy Statement also contained a 'Board Compensation Committee Report on Executive Compensation' signed by Gibson and Rhines." ¶69. The Complaint then identifies the false statements in the Proxy and it also identifies the false statements in the report for which Gibson and Rhines were responsible. *See* ¶70. The Complaint's allegations more than adequately allege falsity and those who were responsible for making the false statements.

**Second,** the false and misleading statements and omissions were an "'essential link'" in the accomplishment of backdated stock option grants. Defendants suggest they were free to misrepresent stock options were being granted in accordance with the stock option plans because the shareholders were being asked to approve the plans to which stock options were granted and not the approval of the individual "stock-option transaction[s]." Defs' Mem. at 15. Approval of the stock option plans pursuant to which stock options were granted was a necessary predicate to the issuance of any stock options. The "option transactions" could not have been accomplished without those plans and the plans would not have been in place absent approval by TriQuint's shareholders.

In *Zoran*, Judge Alsup denied defendants' motion to dismiss §14(a) claims based on concealed backdating practices. *Zoran*, 2007 U.S. Dist. LEXIS 43402, at *76-*78. In *Zoran* plaintiff alleged that "shareholders . . . authorized the stock-option plans" and "kept voting for the board members" in response to the false and misleading proxy solicitations. *Id.* at *66-*68. Judge Alsup held that was a sufficient link to accomplishment of the backdating. *Id.* Here, plaintiffs' allegations are very similar. *See* ¶¶66-98 (in response to Proxies shareholders voted in directors, authorized stock option plans, and authorized increasing number of shares of stock). Here, as in *Zoran*, there is an "essential link" between the Proxy misstatements and the backdating. *Compare Zoran*, 2007 U.S. Dist. LEXIS 43402, at *66-*68 ("shareholders would have voted those board members out, and the board members would no longer have had the means to grant more backdated stock options") *with* ¶¶66-68 (discussing effect of negative votes).

In arguing there could be no "'essential link'" in the accomplishment of the backdated transactions, defendants also contend we cannot show "the shareholders would have voted differently." Defs' Mem. at 15. That is a dubious assumption. But more importantly it is an irrelevant assertion. The false statements were **material**. Had the backdating and related

unauthorized conduct (¶68) been disclosed, a reasonable investor would have considered significant such conduct in making its decision to vote in response to TriQuint's Proxy Statements. *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090 (1991); *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). It takes no stretch of the imagination to understand shareholders would have considered significant the conduct concealed by defendants' false and misleading statements and omissions. Indeed, as Judge Alsup held in *Zoran*, "[a] reasonable shareholder would consider information revealing self-dealing by the board material in deciding how to vote," as well as the granting of backdating options to insiders. *Zoran*, 2007 U.S. Dist. LEXIS 43402, at *64.

There is clearly a link between the false statements and the backdated option grants. Indeed, had shareholders voted down either (i) TriQuint's stock option plans or (ii) the increased number of shares of stock, TriQuint's directors and officers would have found it difficult if not impossible to grant stock options without authorization, *e.g.*, without a stock option plan and without any more authorized stock to grant. Furthermore, it is reasonable to infer it would have been doubtful that the Compensation Committee directors would have been elected directors had their true conduct been disclosed. Far from acting with impunity, the Compensation Committee directors would have found it difficult if not impossible to backdate stock options if they were no longer holding status as directors and therefore no longer the authorized delegates of the Company's stock option plans.

Finally, the Complaint adequately pleads the negligence of those defendants alleged to be responsible for the Proxy Statements. Again, *Zoran* is persuasive. As here, plaintiff alleged proxy statements were false and misleading in stating the board was compliant with stock option plans. *Zoran*, 2007 U.S. Dist. LEXIS 43402, at *64-*66. Judge Alsup also held that the duties of compensation committee members in following the stock option plans "certainly lead to the inference that the compensation committee neglected its duty and was thus negligent," and that the

duties of the audit committee members in "ensuring compliance with accounting standards" also show negligence. *Id*. at *65. Plaintiffs' allegations here are at least as compelling as those in *Zoran*.

### C. The Complaint's §10(b) Claim Is Actionable

#### 1. Legal Standards for Pleading a Violation of §10(b)

Section 10(b) of the Exchange Act prohibits, in pertinent part, "any person, directly or indirectly . . . [from] us[ing] or employ[ing], in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. §78j(b). Rule 10b-5, promulgated thereunder, makes it unlawful for any person to make "any untrue statement of a material fact" or omission of material fact necessary in order to make the statements made not misleading; "[t]o employ any device, scheme, or artifice to defraud" or "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. §240.10b-5(a)-(c).

Thus, to establish a claim under §10(b), plaintiffs must allege that defendants made (1) a misrepresentation or omission; (2) of a material fact; (3) with scienter; (4) relied on by plaintiffs; and (5) that proximately caused them injury. 15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5(a)-(c).

#### 2. The Complaint Adequately Alleges Falsity

Defendants largely do not (and truthfully cannot) dispute TriQuint's SEC filings were materially false and misleading. As with plaintiffs' §14(a) claims, defendants' argument wholly depends on their claimed inadequacy of plaintiffs' backdating allegations.

***First***, the Complaint pleads with particularity that the Company's SEC filings repeatedly misrepresented that options were being granted with an "exercise price at fair market value as of the date of the grant," or words to similar effect. ¶¶70(b)-(c), 73(b)-(c), 76(b)-(c), 82(b)-(c), 85(b)-(c),

88(b)-(c), 91(b)-(c), 94(b)-(c)‚ 97(b), 113, 116, 119, 125, 128, 131, 134.  This was materially false and misleading because stock options were being **backdated**.  *See supra* §§II, III.B.  **Second,** TriQuint's financial statements were materially false and misleading for the same reason.  *See* ¶¶111, 112, 115, 118, 121, 124, 127, 130, 133.

### 3.    The Complaint Adequately Alleges Scienter

The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires that the Complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," or scienter.  15 U.S.C. §78u-4(b)(2).  In assessing whether plaintiffs have sufficiently pled scienter, the court must consider whether all of plaintiffs' allegations "collectively" are sufficient to create a strong inference that defendants acted with scienter even if each inference in "isolation" is not strong.  *Tellabs*, 127 S. Ct. at 2509.  *See also id.* at 2510 ("The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'").  Indeed, with respect to backdating, at least one court has held that "scienter is properly alleged when the complaint alleges both false statements and the defendants' close involvement in the preparation of those statements."  *Zoran*, 2007 U.S. Dist. LEXIS 43402, at *56.  In combination, the magnitude and pervasiveness of defendants' admitted accounting errors, insider trading and the timing of the revelations, supports a strong inference that defendants knew TriQuint's financial statements and Proxies during the relevant period were false.

### a.    Engaging in Backdating and/or Receiving Backdated Options Demonstrates a Strong Inference of Scienter

Here, the Complaint pleads stock option backdating, *i.e.*, intentional misstatement or omission of amounts or disclosure, including (among other conduct) intentional manipulation of stock option grant dates and intentional manipulation of the stock option granting process.

Backdating is an inherently conscious or knowing act and plaintiffs' allegations well demonstrate scienter.

In *Ryan*, 918 A.2d at 341, and *Tyson*, 919 A.2d at 563, the two leading decisions on stock option backdating, the Delaware courts concluded that the act of backdating stock option grants is an inherently conscious or knowing act.

Defendants state we have not pleaded "any of the defendants saw a single 'red flag' that suggested backdating." Defs' Mem. at 10. That is nonsense. The backdated options (both dated and priced) on their face showed they were backdated. For example, in *Ryan*, Chancellor Chandler rejected defendants' arguments concerning knowledge, holding "it is difficult to understand how a plaintiff can allege that directors backdated options ***without*** simultaneously alleging that such directors ***knew*** that the options were being backdated." *Ryan*, 918 A.2d at 355 n.35. "After all," the Court explained, "any grant of options had to have been approved by the [compensation] committee, and that [compensation] committee can be reasonably expected to know the date of the options as well as the date on which they actually approve a grant." *Id*. In *Tyson* the court stated, "[a]t their heart, all backdated options involve a fundamental, incontrovertible lie: directors who approve an option dissemble as to the date on which the grant was actually made." 919 A.2d at 592. *Accord In re UnitedHealth Group PSLRA Litig.*, No. 06-cv-1691 (JMR/FLN), 2007 U.S. Dist. LEXIS 40623 (D. Minn. June 4, 2007).

In *Zoran*, the plaintiff alleged scienter by pleading defendants signed false and misleading SEC filings and "exercised supervision and control over the options-granting process." *Zoran*, 2007 U.S. Dist. LEXIS 43402, at *57-*58. Judge Alsup found that adequate at the pleading stage. *Id*. In doing so, he stated that a defendant who gave "final approval of options grants . . . would have noticed if the grant dates were bogus even if he had not been involved in setting them himself." *Id*.

Indeed, here plaintiffs have asserted the Compensation Committee members backdated and also gave final approval to the backdated grants. *See* ¶¶52-53.

Defendants do not (and reasonably cannot) dispute knowing the date on which they granted or received options and the date for which those options were priced. Because it is reasonable, in fact eminently rational, to conclude that extensive stock option backdating cannot occur absent conscious or knowing acts, well-pleaded allegations of backdating sufficiently demonstrate scienter.

Here, plaintiffs allege stock option backdating occurred during 1998-2002 at TriQuint. ¶¶49-65. The alleged highly suspicious timing of the option grants identified by plaintiffs are supported with empirical evidence. *See supra* §§II, III.B. Because stock option backdating is a conscious or knowing act and given plaintiffs' well-pleaded allegations of backdating as well as the Company's admissions of stock option manipulation, it is reasonable to infer at the pleading stage that those who granted options acted with scienter. Thus, plaintiffs adequately plead that defendants Sharp, Gary, Gibson, Kauser and Rhines, who approved backdated options for themselves or others, acted with scienter. *See supra* §§II, III.B; ¶¶52-65.

Furthermore, Gary, Gibson, Kauser and Rhines were members of TriQuint's Compensation Committee at various points in the relevant period and were all well versed in the particulars of the stock option plans and the requirements that the exercise price be equivalent to fair market value at the date of grant. ¶¶49-52. The fact that these defendants violated the policies and stock option plans they asked shareholders to put in place also permits a strong inference of fraudulent intent. *See Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (violation of company's own policies on revenue recognition on OEM contracts); *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996); *Rothman v. Gregor*, 220 F.3d 81, 91 (2d Cir. 2000); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001). Moreover, Gary and Gibson were also members of the Audit Committee, and so was Young.

*See* ¶¶28-30, 108.  It was their obligation to review the Company's accounting for these options and in so doing, were charged with knowing the options' fortuitous strike prices in order to undertake an APB No. 25 accounting treatment.  ¶99.

TriQuint's executives were also involved in the backdating.  Beyond the defendants who engaged in backdating options, even those defendants who only received backdated stock options acted with scienter when selling their stock.  Those defendants are Sharp, Fournier, Whitehurst, Winn, Pye, Cordner, Welty and Link.  *See* ¶¶20, 50, 56, 58-59, 61-62 (Sharp); ¶¶21, 50, 58-61 (Pye); ¶¶22, 50, 57 (Whitehurst); ¶¶23, 50, 56 (Winn); ¶¶24, 50, 58-61 (Welty); ¶¶25, 50, 58-61 (Cordner); ¶¶26, 50, 61(Link); ¶¶27, 50, 55-56, 58-61 (Fournier).  It simply defies logic that these defendants received ideally timed and backdated options on multiple occasions for tens of thousands of shares without knowing that they had been so enriched and without knowing the date they received options and the date for which those options were priced.

        **b.**    **Defendants' Violation of GAAP and TriQuint's Stock Option Plans Raise a Strong Inference of Scienter**

It is well-settled law that "[v]iolations of GAAP standards can also provide evidence of scienter."  *See In re Daou Sys.*, 411 F.3d 1006, 1016 (9th Cir. 2005); *see also Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 79, 83 (1st Cir. 2002) (finding scienter sufficiently alleged where defendants violated FAS 48 and their own internal revenue recognition policies); *Malone v. Microdyne Corp.*, 26 F.3d 471, 478 (4th Cir. 1994) ("We cannot find a single precedent, however, holding that a company may violate FAS 48 and substantially overstate its revenues . . . without running afoul of Rule 10b-5.").

Here, plaintiffs' allegations raise a strong inference of scienter by describing the stock option accounting violations with particularity.  The Complaint alleges that the backdating of stock option grants expressly violated TriQuint's Stock Option Programs which were in place during the relevant

timeframe.  The basic terms of the plans remained unchanged throughout.  According to public disclosures, under the plans, the option price of options granted had to be at least equal to the fair market value of the Company's common stock at the date of the grant.  ¶¶49-50, 70(b)-(c), 73(b)-(c), 76(b)-(c), 79(b)-(c), 82(b)-(c), 85(b)-(c), 88(b)-(c), 91(b)-(c), 94(b)-(c), 97(b)-(c).  However, in reality, stock options were granted with an exercise price lower than the fair market value at the date of the grant.  Thus, the alleged backdating violated the express provisions of TriQuint's own Stock Option Programs.

As a result of the backdating, the stock option grants were not recorded as necessary to permit the proper preparation of financial statements in conformity with GAAP.  *See, e.g.*, ¶¶103, 111-13, 115-16.  TriQuint's financial statements reported in the Company's 1998-2006 Reports on Form 10-K (and other filings) did not fairly present TriQuint's financial condition because they failed to account for defendants' in-the-money grants as compensation expense and thus materially overstated net income or materially understated its net loss.  ¶¶111-12, 115, 118, 121, 124, 127, 130, 133.  The Company's Reports on Form 10-K also included materially false and misleading financial statements from previous years that understated compensation expenses due to earlier, disguised, in-the-money option grants about which defendants knew and/or approved.  *Id.*

### c.    Certain Defendants' Sarbanes-Oxley Certifications and Other SEC Filings Support the Scienter Allegations

Defendants Link and Welty signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") as part of TriQuint's SEC filings.  *See* ¶¶126, 129, 132, 135.  Those certifications help support plaintiffs' allegations of scienter against these defendants.  In accordance with §302 of Sarbanes-Oxley, these defendants certified that (i) they had designed internal controls and procedures to ensure that material information was made known to them by others within the Company during the period covered by the report; (ii) they had personally evaluated the

effectiveness of those controls within the last 90 days; and (iii) any deficiencies in those controls and procedures had been disclosed in the Form 10-Q, as well as to the Company's outside auditors and internal audit committee. 15 U.S.C. §7241. In addition to the fact that Link and Welty actually solicited TriQuint's shareholders to approve stock option plans (*see* ¶¶84-95) they violated by engaging in and/or receiving backdated options, the certifications support an inference that these defendants understood the negative financial reporting ramifications of backdated stock options and were at least deliberately reckless in causing or permitting false financial statements to be published.

Internal controls are those systems and processes which are designed to assure the accuracy of publicly reported information by, among other things, assuring that balance sheet entries have documented support, and that significant variations from established procedures cannot be made without multiple levels of review and approval.[29] In *In re Lattice Semiconductor Corp. Sec. Litig.*, No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262 (D. Or. Jan. 3, 2006), the District of Oregon concluded that because of the facts attested to therein, a CEO's and CFO's "Sarbanes-Oxley certifications provide an inference of at least deliberate recklessness." *Id.* at *45.

"[W]hen a corporate officer signs a document on behalf of the corporation, that signature will be rendered meaningless unless the officer believes that the statements in the document are true."

---

[29]    Sarbanes-Oxley provides the following definition:

> Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosures.

17 C.F.R. §§240.13a-15(e), 240.15d-15(e).

*Howard v. Everex Sys.*, 228 F.3d 1057, 1061 (9th Cir. 2000). Additional allegations that defendants signed false financial statements also directly evidence scienter. *In re Syncor Int'l Corp. Sec. Litig.*, 327 F. Supp. 2d 1149, 1168-72 (C.D. Cal. 2004) (citing *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 365 (5th Cir. 2004) (corporate officers' signature on a document links them to the fraudulent statements therein)).

Here, a strong inference can be drawn that defendants, who engaged in backdating and/or received backdated options, knew, or were deliberately reckless in not knowing, that these certifications and financial statements were materially false and misleading and that TriQuint's financial statements for those years did not fairly present the Company's financial condition.

### 4.    Plaintiffs Adequately Plead Reliance

Here, TriQuint reasonably relied upon defendants' false statements about the granting of stock options at fair market value and to its detriment did not record compensation expense for in-the-money options. ¶¶5, 8-10, 103, 111-34, 156. Defendants assert there can be no reliance because the backdated stock option grants were made before the issuance of any statements concerning the grants. Defs' Mem. at 9. That is a convenient but erroneous rationalization.

*First*, the Ninth Circuit has held a stock option plan involves "contracts to sell stock for money at a later date" and thus is a "sale under the securities laws because it is a contract to sell a security when the option is exercised." *See, e.g.*, *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1130 (9th Cir. 2002) (finding that fraud with respect to employee stock option plans was "'in connection with' the 'sale or purchase of a covered security'" under SLUSA). *See also* 15 U.S.C. §78c(a)(10) (defining "security" to include any "option"). Indeed, misrepresentations about the value of options, such as the exercise price, are inherently misrepresentations "'in connection with'" the options. *See, e.g.*, *Falkowski*, 309 F.3d at 1131. *Second*, TriQuint relied to its detriment on defendants to issue

CONSOLIDATED OPP TO MOTIONS TO DISMISS FILED BY DEFS &
NOMINAL PARTY TRIQUINT SEMICONDUCTOR, INC.

Page 48

accurate and truthful financial statements.  The suggestion by defendants that TriQuint could not have reasonably relied on its own financial statements in connection with the issuance of its stock (by increasing authorized stock as well as granting options) is absurd.  **Finally**, TriQuint was perfectly entitled to rely on repeated historical statements of defendants in connection with increasing authorized stock as well as granting options.

In *Zoran*, the plaintiff alleged Zoran relied on the false statements (i) when it sold stock to its officers and directors for less than the corporation was entitled to received, and (ii) "[a]s to unexercised options," when it awarded options of more value to the recipient than authorized. *Zoran*, 2007 U.S. Dist. LEXIS 43402, at \*54.  Judge Alsup found such allegations "pled the elements of transactional causation and reliance."  Here, plaintiffs make similar if not identical allegations.  *See* ¶¶5, 9-10, 111-12, 115, 118, 121, 124, 127, 130, 133, 139, 141, 156 (TriQuint was entitled to rely on its financial and related statements in connection with the issuance of its stock (by increasing authorized stock as well as granting options and because TriQuint is counterparty to options, exercise of stock options diverts money "at the expense of the Company")).

The Complaint alleges that the backdating of stock option grants and issuance thereof in the amounts awarded to defendants caused, and continues to cause, substantial harm to TriQuint and to its shareholders.  ¶¶8-12, 39-40, 139, 156.  Backdating stock option grants represents a direct and continuing waste of valuable corporate assets.  *Id.*  Because TriQuint is the counterparty to the option contracts, when the defendants exercise their backdated options, money is siphoned on a dollar-for-dollar basis directly from the Company.  ¶139.  The result is that the backdated grants give the defendants an option to purchase TriQuint shares directly from the Company at an unfair and improper low price.  Meanwhile, the Company shoulders the concealed compensation expense

represented by the difference between the price at which the option should have been granted and the lower, backdated, grant price. *Id.*

In any event, reliance is a factual inquiry not appropriate for resolution on a motion to dismiss. *See In re Daley's Dump Truck Servs.*, 108 F.3d 213, 215 (9th Cir. 1997) (in contract rescission action, justifiable reliance "normally a factual question to be determined by the jury"); *In re Accelr8 Tech. Corp. Sec. Litig.*, 147 F. Supp. 2d 1049, 1057 (D. Colo. 2001) (reliance involves "detailed factual inquiry and is rarely amenable to resolution under a motion to dismiss standard"); *Primavera Familienstiftung v. Askin*, 173 F.R.D. 115, 127 (S.D.N.Y. 1997) (same); *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp. 1512, 1527 (M.D. Fla. 1989) (same).

For all of these reasons, defendants' argument and the cases purportedly cited in support thereof (Defs' Mem. at 10), does ***not*** support dismissal

### 5.   Plaintiffs Adequately Plead Loss Causation

The Complaint pleads loss causation by alleging a "causal connection" between plaintiffs' economic loss and defendants' scheme to defraud. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-48 (2005).[30]  The *Dura* opinion analyzed loss causation in two discrete sections:  §II-A, concerning plaintiffs' ultimate burden of proof, and §II-B, pleading requirements.  The pleading section of *Dura* contains the core of the Court's loss-causation guidance, as the case had been at the motion-to-dismiss stage – like this one.

---

[30]     Although plaintiffs satisfy *Dura*, the case is factually inapplicable in that it addresses loss causation in the context wherein shareholders are suing the corporation to recover their own trading losses, rather than in the derivative context wherein the economic loss is that of the Company from several avenues such as diversion of corporate assets, costs of investigation and litigation, and loss of market capitalization stemming from the underlying conduct. *See Dura*, 544 U.S. at 339 (plaintiffs suing *Dura* to recover trading losses).

The *Dura* Court noted that Rule 8(a)(2)'s "'short and plain statement'" controls loss causation pleading, as there appeared to be no "special further requirement in respect to the pleading of proximate causation or economic loss." *Id*. at 346. Given this ordinary pleading rule, "it should not prove burdensome" to provide defendants with "some indication" of a plaintiff's claimed loss, and whatever causal connection between that loss and defendants' conduct "that the plaintiff has in mind." *Id*. at 347. According to defendants, however, loss causation is not adequately alleged because plaintiffs must aver defendants exercised the backdated options or caused the Company to grant the backdated options. Defs' Mem. at 9. That is incorrect for a number of reasons.

***First***, in focusing only on the backdated options defendants received, defendants ignore that there are multiple sources of economic losses TriQuint suffered and continues to suffer. By approving backdated grants to defendants, the Board: (i) diverted tens of millions of dollars of corporate assets to top insiders, including themselves; (ii) caused TriQuint to materially understate its compensation expenses and materially overstate its net income or materially understate its net loss by granting options at less than fair market value as of the date of the grant, resulting in additional compensation expense, loss of market capitalization and exposure to potential liability for violations of the securities laws; (iii) subjected TriQuint to substantial investigative costs and massive potential liability from regulators, including the SEC and the Internal Revenue Service; and (iv) damaged the Company's credibility with shareholders and business partners alike. ¶¶39-40.

***Second***, in focusing only on the backdated options defendants received, those defendants who engaged in backdating stock options also ignore the losses TriQuint suffered from options granted not only to defendants but to other TriQuint employees. Even assuming plaintiffs were required to precisely allege how many shares were "obtained by exercise" of backdated options and how much damages flowed from those very options (plaintiffs are not) the Complaint identifies

backdated options defendants received and gives some indication of how many backdated options damaged TriQuint. ¶¶50-51.

*Third*, *Dura* does **not** impose the exacting requirement defendants suggest. Plaintiffs need only provide a "'short and plain statement'" with "some indication" of a plaintiff's claimed loss, and the causal connection between that loss and defendants' conduct, with no "special further requirement in respect to the pleading of proximate causation or economic loss." *Dura*, 544 U.S. at 346-47. Plaintiffs here have amply satisfied *Dura*.

### 6.    Plaintiffs Sufficiently Plead Violations of Rule 10b-5(a) and (c), Which Prohibit (Among Other Conduct) Engaging in a Scheme to Defraud and/or Insider Trading

Ignoring that plaintiffs have alleged false and misleading statements by most of them, defendants assert plaintiffs "[f]ail to [p]lead [p]ersonal [p]articipation . . . in a '[s]cheme.'" Defs' Mem. at 7. Plaintiffs have also met the requirements of the PSLRA by alleging that each defendant violated Rule 10b-5 (a) and (c) by backdating stock options and/or insider trading with knowledge of the backdating at TriQuint. *See Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 11 n.7 (1971) ("'We believe that §10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception.'").

### a.    Certain Defendants Engaged in Stock Option Backdating, Which Is Deceptive Conduct

Defendants contend plaintiffs fail to aver their own conduct had a deceptive purpose and effect. Defs' Mem. at 7-8. But **backdating** is deceptive conduct and plaintiffs identify those defendants who backdated and the grants they backdated.

As shown herein, plaintiffs adequately demonstrate backdating occurred at TriQuint. *See supra* §§II, III.B. Defendants do not dispute backdating is deceptive conduct. A number of

defendants engaged in backdating, the principal purpose and effect of which was to create a false appearance of fact, namely the granting of options at fair market value and without compensation expense. *See Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1047-51 (9th Cir. 2006), *petition for cert. filed* (Oct. 19, 2006). In truth, the options were backdated and under priced, which concealed compensation expense and the diversion of assets and profits to those who received them. ¶¶9, 48, 50, 139. This had a false and misleading effect on TriQuint's SEC filings, for it caused the understatement of compensation expense and overstatement of profit (among other falsities and omissions). *See* ¶¶100, 103, 111-12, 115, 118, 121, 124, 127, 130, 133.

And contrary to defendants' assertion, plaintiffs sufficiently aver *who* backdated options (Sharp, Gary, Gibson, Kauser and Rhines (¶¶52-53)), *what* options were backdated (¶50), approximately *when* the options were backdated, and *how* the options were backdated. *See* ¶¶48-53. Furthermore, despite what defendants suggest, plaintiffs do not bring securities claims for "'aiding and abetting'" (Defs' Mem. at 7) and defendants are not secondary actors, for they signed and/or prepared the issuer's (TriQuint's) SEC filings. For all of these reasons, defendants' argument and cases purportedly cited in support thereof (Defs' Mem. at 7-8), do *not* support dismissal.

### b. Certain Defendants Engaged in Insider Trading, Which Is Deceptive Conduct

Defendants Cordner, Fournier, Gary, Gibson, Link, Pye, Rhines, Sharp, Welty, Whitehurst and Winn all engaged in insider selling for proceeds in excess of $72 million. *See, e.g.*, ¶101. Having backdated stock options and/or received backdated stock options, these defendants therefore had inside knowledge of backdating at TriQuint. *See* ¶¶20-30, 50-63. Trading on inside information alone is a "deceptive device" sufficient to impose liability under §10(b). *See United States v. O'Hagan*, 521 U.S. 642, 652 (1997). As held by the Ninth Circuit in *Am. West*, 320 F.3d at 937, insider trading is a deceptive device or act that suffices for §10(b) liability, and the fact that a

defendant did not make "any of the allegedly misleading statements does not shield them from liability."

Moreover, defendants who sold TriQuint's stock are further liable under the "disclose-or-abstain" doctrine.  Regardless of whether a defendant made a false statement, "an individual corporate insider in possession of material non public information is prohibited by the federal securities laws from trading on that information unless he makes public disclosure.  He must disclose or abstain from trading." *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1203 (1st Cir. 1996); *see also O'Hagan*, 521 U.S. at 651-52; *Chiarella v. United States*, 445 U.S. 222, 226-29 (1980); *SEC v. Adler*, 137 F.3d 1325 (11th Cir. 1998) (insider trading on non-public information, even in the absence of false statements, sufficient to establish liability under §10(b) and Rule 10b-5).

## V.    Defendants' Time-Based Defenses Lack Merit

Defendants argue for dismissal of all claims on the basis of various statutes of limitation and repose.  Plaintiffs timely brought their claims.  *See infra* §V.A.  Moreover, as has been recognized by Chancellor Chandler and Judge Alsup, the nature of this case presents an exceptional circumstance for application of equitable tolling.  *See infra* §V.B.  Backdating is extremely difficult to detect and defendants repeatedly affirmatively represented options were priced as of the date of the grant and in accordance with TriQuint's Stock Option Programs.  Indeed, were it not for the statistical anomalies observed when option grants were studied over a period of years using CFRA's and Merrill Lynch's methodologies, the conduct of defendants would still be concealed today.

### A.    Plaintiffs' §10(b), §14(a) and Breach of Fiduciary Duty Claims Are Timely

Defendants contend all of plaintiffs' §§10(b) and 14(a) claims are barred for being filed beyond "inquiry notice," because "long before" plaintiffs filed their action the option grants were "publicly available" (Defs' Mem. at 12) or "publicly reported" (Defs' Mem. at 16) in SEC filings.

They make a similar argument as to plaintiffs' claims arising out of their breaches of fiduciary duty. *See* Defs' Mem. at 23. "This defense is unconvincing." *Ryan*, 918 A.2d at 360.

Plaintiffs could not have been reasonably expected to figure out defendants' backdating scheme as it was occurring, and file their Complaint years earlier than they did. As Chancellor Chandler held in *Ryan*, "[s]hareholders may be expected to exercise reasonable diligence with respect to their shares, but this diligence does not require a shareholder to conduct complicated statistical analysis in order to uncover alleged malfeasance." *Id.* Indeed, shareholders "may rely on public filings and accept them as true, and need not assume that directors and officers will falsify such filings." *Id.* Similarly, in *Zoran*, defendants argued (as defendants do here) that disclosure of stock option grant prices provided inquiry notice of the backdating. *Compare Zoran*, 2007 U.S. Dist. LEXIS 43402, at *57-*61 (proxies provided notice of "too-low grant price") *with* Defs' Mem. at 12, 16 (arguing SEC filings disclosing existence of option grants provided notice). Judge Alsup rejected that argument, holding that inquiry notice does not apply in this situation: "Outsiders like plaintiff did not have superpowers to detect secret backdating inside the company." *Zoran*, 2007 U.S. Dist. LEXIS 43402, at *60.

A five-year statute of repose applies to plaintiffs' §10(b) claims, and a three-year statute of repose applies to plaintiffs' §14(a) claims. *See* 28 U.S.C. §1658(b); *Omni Fin. Corp. v. Cohen*, No. 91 Civ. 6837 (RO) (THK), 1994 U.S. Dist. LEXIS 3357, at *26-*27 (S.D.N.Y. Mar. 22, 1994). Defendants assert the period of repose runs backwards from the filing of the first complaint in this action, and that, as a result, plaintiffs purportedly cannot base the majority of their §10(b) claims on "[a]ny grant issued on or before February 28, 2002." Defs' Mem. at 11. As to plaintiffs' §14(a) claims, defendants similarly contend all proxy statement occurrences taking place prior to February 28, 2004, are barred by the statute of repose. *Id*. at 16. Defendants are incorrect.

The Complaint alleges deceptive conduct whereby defendants secretly backdated stock options and that the backdating of options caused TriQuint's financial statements (including as reported in the Company's Reports on Forms 10-K and 10-Q) and annual Proxy Statements throughout the relevant period to be materially false and misleading.  ¶¶66-99, 111-36.  This continued with respect to TriQuint's financial statements at least until March 16, 2006, when defendants caused TriQuint to file its 2005 Report on Form 10-K. ¶133.  TriQuint's 2005 Report on Form 10-K was materially false and misleading because it: (a) was presented in violation of GAAP, due to its improper accounting for backdated stock options; and (b) contained material misrepresentations which defendants knew to be false, one such misrepresentation being that no compensation costs were recorded for option grants "[a]s the fair value was equal to the grant price on the date of grant." ¶¶133-134.  The scheme continued with respect to TriQuint's annual Proxy Statements at least until May 16, 2006, when defendants caused TriQuint to file and disseminate its 2006 Proxy Statement.    ¶96.    TriQuint's 2006 Proxy Statement contained material misrepresentations and omissions of which defendants knew or deliberately recklessly disregarded, such as: the exercise price of options granted under the Company's stock option plan were "not . . . less than the fair market value of our common stock on the date of grant."  ¶97(b).

Because it is well-settled that the running of the statute of repose as to plaintiffs' §§10(b) and 14(a) claims "'begins when the *last* alleged misrepresentation was made,'" the repose period for plaintiffs' §§10(b) and 14(a) claims began to run, at the earliest, on March 13, 2006, and May 16, 2006, respectively.  *Durning v. Citibank, Int'l*, 990 F.2d 1133, 1136 (9th Cir. 1993); *accord In re Dynex Capital Sec. Litig.*, No. 05 Civ. 1897 (HB), 2006 U.S. Dist. LEXIS 4988, at *13 (S.D.N.Y. Feb. 10, 2006) ("In a case like this one, in which a series of fraudulent misrepresentations is alleged, this 'period of repose begins when the last alleged misrepresentation was made.'"); *Quaak v. Dexia,*

CONSOLIDATED OPP TO MOTIONS TO DISMISS FILED BY DEFS &
NOMINAL PARTY TRIQUINT SEMICONDUCTOR, INC.

Page 56

*S. A.*, 357 F. Supp. 2d 330, 338 (D. Mass. 2005) ("Under Section 10(b), the statute of repose runs from the date of the last fraudulent misrepresentation . . . .  Thus, the period of repose in this case was triggered on . . . the date of [the] last allegedly false financial statement.").[31]

The first shareholder derivative action now consolidated as part of this action was filed on February 28, 2007.  Accordingly, plaintiffs' §10(b), §14(a) and California statutory claims were brought within the period of repose and each defendant is subject to liability for deceptive conduct during the period of repose.[32]  For example, each defendant is alleged to have participated in the issuance of materially false and misleading statements within the five-year statutory repose period for §10(b) claims.  ¶¶69, 72, 75, 78, 81, 84, 87, 90, 93, 96, 108 (chart), 114, 117, 120, 123, 126, 129, 132, 135.

Insofar as defendants contend that pre-repose wrongdoing cannot, in part, form the basis for plaintiffs' §§10(b) and 14(a) claims based on false and misleading statements made during the repose period, they are wrong.  The making of false statements to shareholders and other deceptive conduct outside the statute of repose period neither creates a license for defendants to continue their fraud without consequence into the actionable period, nor sanitizes defendants' actionable false and

---

[31]    *See also Borden, Inc. v. Spoor Behrins Campbell & Young*, 778 F. Supp. 695, 699 (S.D.N.Y. 1991) (under previous statute of repose, plaintiff was required to initiate suit within three years of most recent violation); *In re Stone & Webster, Inc. Sec. Litig.*, No. 00-10874-RWZ, 2006 U.S. Dist. LEXIS 42061, at *7 (D. Mass. June 23, 2006) (holding that the "period of repose begins to run on the date that the fraudulent activity occurred, which ***in securities fraud cases is the date of the defendant's last fraudulent misstatement***"); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, No. 05 Civ. 1898 (SAS), 2005 U.S. Dist. LEXIS 19506, at *19 (S.D.N.Y. Sept. 6, 2005), *cert denied*, 2006 U.S. Dist. LEXIS 52991 (S.D.N.Y. Aug. 1, 2006) ("the period of repose [for a §10b claim] 'begins ***when the last alleged misrepresentation was made***'").

[32]    As defendants concede, there is no statute of repose that "bars" plaintiffs' fiduciary duty- and equity-based claims.  *See* Defs' Mem. at 16.  Defendants' time-based arguments with respect to those claims are based on assertions related to inquiry notice only.

misleading statements. *See, e.g.*, *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 689 (S.D. Tex. 2002) (holding that time-barred fraudulent transactions may be used: (a) as evidence of an alleged scheme to defraud, and (b) to establish scienter during the actionable period); *Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2006 U.S. Dist. LEXIS 60858, at *26, *38 (N.D. Cal. Aug. 14, 2006) (Alsup, J.) (holding that where a complaint "alleges a persistent and deliberate scheme to use half truths," claims based on "violations [that] are alleged to have occurred" within the repose period will survive dismissal).

### B. Defendants Cannot Rely on Any Statute of Limitations Defense, for Plaintiffs Adequately Plead Fraudulent Concealment

As shown above, defendants' arguments based on inquiry notice lack merit. In addition, defendants should not be entitled to rely on any statutes of limitation. It is well established in Delaware courts that the statute of limitations is tolled where defendants engage in "fraud or concealment of the facts which would have disclosed" the wrongdoing. *Kahn v. Seaboard Corp.*, 625 A.2d 269, 276 (Del. Ch. 1993). As Chancellor Chandler recognized in *Ryan*, a case less compelling than here, claims of this nature present an exceptional circumstance for application of equitable tolling on the basis of fraudulent concealment. *Compare* ¶¶49-64 (allegations of backdating and concealment in this case) *with* Ex. 5, ¶46 (concealment allegations in *Ryan*).

Like defendants here, in *Ryan* the defendants argued that the statute of limitations barred all claims because "historical stock prices" were "publicly available" well before plaintiff filed his complaint. 918 A.2d at 359. The court rejected defendants' argument, holding "defendants may not rely on the statute of limitations as a defense," for intentionally "[i]naccurate public representations as to whether directors are in compliance with shareholder-approved stock option plans constitute fraudulent concealment of wrongdoing sufficient to toll the statute of limitations." *Id.* at 360. As in *Ryan*, here "[d]efendants allegedly caused [the Company] to falsely represent that the exercise price

CONSOLIDATED OPP TO MOTIONS TO DISMISS FILED BY DEFS & NOMINAL PARTY TRIQUINT SEMICONDUCTOR, INC.

Page 58

of all the stock options it granted pursuant to its stock option plans was no less than the fair market value . . . on the date of the grant." *Id.* "Further, the existence of fraudulent concealment is supported by the fact that no one noticed . . . [backdating] for at least six years." *Id.* 360 n.60.

The Complaint alleges that while backdating, certain defendants were affirmatively misrepresenting options were being granted in accordance with the Company's stock option plans. ¶¶49-53, 66-99.

For all of the reasons stated, defendants should not be entitled to rely on any statute of limitations defense to dismiss plaintiffs' claims.

## VI.    Conclusion

For all the reasons stated herein, the individual defendants' and TriQuint's motions to dismiss should be denied.

DATED:  September 28, 2007                    Respectfully submitted,

                                                        COUGHLIN STOIA GELLER
                                                            RUDMAN & ROBBINS LLP


                                                        s/ James I. Jaconette
                                                        ────────────────────────────
                                                        JAMES I. JACONETTE (*pro hac vice*)
                                                        jamesj@csgrr.com
                                                        TRAVIS E. DOWNS III
                                                        travisd@csgrr.com
                                                        BENNY C. GOODMAN III
                                                        bennyg@csgrr.com
                                                        MARY LYNNE CALKINS
                                                        mcalkins@csgrr.com
                                                        655 West Broadway, Suite 1900
                                                        San Diego, CA  92101-3301
                                                        Telephone:  619/231-1058
                                                        619/231-7423 (fax)

GRENLEY, ROTENBERG, EVANS,
  BRAGG & BODIE, P.C.

GARY I. GRENLEY, OSB No. 75138
ggrenley@grebb.com
PAUL H. TRINCHERO, OSB No. 014397
ptrinchero@grebb.com
Telephone:  503/241-0570
503/241-0914 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
JOHN K. GRANT
jgrant@csgrr.com
SHAWN A. WILLIAMS
shawnw@csgrr.com
MONIQUE C. WINKLER
mwinkler@csgrr.com
AELISH M. BAIG
abaig@csgrr.com
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

THE WEISER LAW FIRM, P.C.
ROBERT B. WEISER
rw@weiserlawfirm.com
121 N. Wayne Avenue, Suite 100
Wayne, PA  19087
Telephone:  610/225-2677
610/225-2678 (fax)

Attorneys for Plaintiffs

S:\CasesSD\Triquint Derivative\BRF00045963.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 28, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on September 28, 2007.

<div style="margin-left:40%;">

 s/ James I. Jaconette
JAMES I. JACONETTE

COUGHLIN STOIA GELLER
        RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:jamesj@csgrr.com

</div>

# Mailing Information for a Case 3:07-cv-00299-MO

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Douglas J. Clark**
  dclark@wsgr.com

- **Claire Loebs Davis**
  cldavis@wsgr.com,npierce@wsgr.com

- **Douglas W. Greene**
  dgreene@wsgr.com,npierce@wsgr.com

- **Gary I. Grenley**
  ggrenley@grebb.com,jbecker@grebb.com

- **James I. Jaconette**
  jamesj@csgrr.com,e_file_sd@csgrr.com

- **Kelley E. Moohr**
  kmoohr@wsgr.com

- **Paul H. Trinchero**
  ptrinchero@grebb.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`