IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SVETLANA BELOVA, Derivatively on
Behalf of TRIQUINT SEMICONDUCTOR, INC.,

No. CV 07-299-MO

       Plaintiff,

OPINION & ORDER

  v.

STEVEN J. SHARP et al.,

       Defendants,

    -and-

TRIQUINT SEMICONDUCTOR, INC., a
Delaware corporation,

       Nominal Defendant.


**Mosman, J.**,

      TriQuint Semiconductor, Inc., and the individual defendants (collectively "defendants")

each move to dismiss this consolidated shareholder derivative suit brought by Svetlana Belova

and Bradley Bullard (the "shareholders") for failure to state a claim and failure to make a pre-suit

demand.  Because the shareholders do not adequately allege contemporaneous ownership, I

GRANT the Motions to Dismiss (#20 & #22) without prejudice and with leave to amend.  I also

address the other arguments for dismissal, making future motions to dismiss unnecessary once

the Complaint is properly amended.

# BACKGROUND

The defendants allegedly engaged in a scheme of stock options backdating, diverting hundreds of millions of dollars to TriQuint insiders.  They also allegedly participated in concealing the backdating and/or refusing to assert TriQuint's legal rights.  Based on this, the shareholders allege violations of federal and state law, including breaches of fiduciary duties, abuse of control, fraud, corporate waste, unjust enrichment, and gross mismanagement.[1]

Backdating is a form of fraud under federal and state law.  *See, e.g.*, *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 996-97 (N.D. Cal. 2007) (discussing backdating).  Former Securities and Exchange Commission ("SEC") Chairman Harvey Pitt said:

> What's so terrible about backdating options grants?
>
> For one thing, it likely renders a company's proxy materials false and misleading.  Proxies typically indicate that options are granted at fair market value.  But if the grant is backdated, the options value isn't fair—at least not from the vantage point of the company and its shareholders.
>
> For another, backdating means a corporate document used to permit access to corporate assets has been falsified . . . .  Moreover, . . . illegal insider trading may also have occurred.
>
> . . . On the state level, backdating could involve a breach of fiduciary duty, a waste of corporate assets and even a usurpation of a corporate opportunity.
> . . . .
> Those who backdate options grants violate federal and state law.  And those on whose watch this conduct occurs are also potentially liable: If they knew about the backdating, they're participants in fraudulent and unlawful conduct.  If they didn't know about the backdating, the question will be: Should they have done more to discover it?

Compl. (#15) ¶ 7 (quoting Harvey Pitt, *The Next Big Scandal*, Forbes, May 26, 2006, http://www.forbes.com/).

---

[1] The shareholders allege a total of eleven claims for relief.  *See* Compl. (#15) ¶¶ 145-96.

PAGE 2 OPINION & ORDER

"A fundamental requirement of . . . [TriQuint's] Stock Option Programs always has been that the exercise price for incentive stock options be not less than 100% of the fair market value per share on the date of the grant." *Id.* ¶ 50. Thus, based on the theories discussed by former Chairman Pitt, the shareholders allege:

> [D]efendants caused TriQuint to file false and misleading statements with the SEC, including proxy statements filed with the SEC which stated that the options granted by TriQuint carried with them an exercise price that was not less than the fair market value of TriQuint stock on the date of grant and issuance.[2]

*Id.* ¶ 8 (emphasis omitted). Based on a statistical analysis, the shareholders allege the following option grants[3] to various defendants were backdated:

| Grant Date | Recipient(s) | Approved By |
|---|---|---|
| 04/16/1998 | Fournier | Sharp, Gibson, Rhines |
| 12/02/1998 | Sharp, Fournier, Winn, Pye | Sharp, Gibson, Rhines |
| 10/18/1999 | Whitehurst | Sharp, Gibson, Rhines, Gary |
| 12/01/1999 | Kauser, Sharp, Cordner, Pye, Fournier, Welty | Sharp, Gibson, Rhines, Gary |
| 12/21/2000 | Sharp, Pye, Cordner, Fournier, Welty | Sharp, Gibson, Rhines, Gary |
| 04/04/2001 | Fournier, Cordner, Welty, Pye | Sharp, Gibson, Rhines, Gary |
| 12/21/2001 | Sharp, Pye, Cordner, Fournier, Welty, Link | Sharp, Gibson, Rhines, Gary |
| 04/29/2002 | Sharp | Sharp, Gibson, Rhines, Gary |

The shareholders allege their analysis of these grants "reveals that stock option grants were dated: (i) near or on the very day that TriQuint's stock price hit its low price for the month, quarter and/or year; and/or (ii) in advance of significant stock price increases." *Id.* ¶ 54.

---

[2] The shareholders identify specific proxy statements they believe were false and misleading. *Id.* ¶¶ 66-103.

[3] *See id.* ¶ 50.

PAGE 3 OPINION & ORDER

Furthermore, "[t]he odds of defendants 'fortuitously' choosing option grant dates year after year at historic low closing prices absent intentional manipulation are so extremely remote that backdating must have taken place." *Id.* Based on their statistical analysis of the option grants, the shareholders allege various violations of state and federal law. *See id.* ¶¶ 145-96.

The defendants filed a Motion to Dismiss the Verified Consolidated Shareholder Derivative Complaint for Failure to State a Claim (#20), and nominal defendant TriQuint filed a Motion to Dismiss the Verified Consolidated Shareholder Derivative Complaint for Failure to Make a Pre-Suit Demand (#22).

## DISCUSSION

### I.    <u>Standard of Review</u>

#### A.    *12(b)(6) Motions to Dismiss*

A court should dismiss a complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) if the complaint does not "raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007) (citation omitted) (footnote omitted). "[C]onclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Associated Gen. Contractors of Am. v. Metro. Water Dist. of So. Cal.*, 159 F.3d 1178, 1181 (9th Cir. 1998). Furthermore, certain claims, such as those for fraud, must meet the heightened pleading standards of Federal Rule of Civil Procedure 9.[4] If a complaint is dismissed for failure to state a claim, "a district court should grant leave to amend even if no request to amend the pleadings

---

[4] "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

was made, unless it determines that the pleading could not possibly be cured by the allegation of

other facts." *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995) (internal quotation marks

omitted).

> **B.**    ***Shareholder Derivative Suits***

Derivative actions are brought by a shareholder to enforce a corporation's rights when the

corporation itself fails to enforce its rights.  *See Daily Income Fund, Inc. v. Fox*, 464 U.S. 523,

528-34 (1984).  Derivative suits are subject to the procedural requirements of Federal Rule of

Civil Procedure 23.1.  *See Greenspun v. Del E. Webb Corp.*, 634 F.2d 1204, 1208-10 (9th Cir.

1980) (affirming dismissal of a derivative action for failure to comply with Rule 23.1).  Rule 23.1

requires the complaint: (1) "allege that the plaintiff was a shareholder or member at the time of

the transaction complained of"; and (2) "state with particularity . . . any effort by the plaintiff to

obtain the desired action from the directors or comparable authority and, if necessary, from the

shareholders or members; and . . . the reasons for not obtaining the action or not making the

effort."  Fed. R. Civ. P. 23.1(b).

Rule 23.1 does not establish the circumstances under which demand would be futile.

Instead, demand futility is determined under the law of the company's incorporating state—in this

case, Delaware.  *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 989-90 (9th Cir. 1999)

(citing *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991)).  Under Delaware law, a court

limits its consideration to the particularized facts alleged in the complaint; the burden is thus

more onerous than that required to withstand an ordinary motion to dismiss.  *See Aronson v.

Lewis*, 473 A.2d 805, 813-15 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 796

A.2d 244 (Del. 2000).  "Conclusory 'allegations of fact or law [which are] not supported by

allegations of specific fact may not be taken as true.'" *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991) (quoting *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988)).

II.    **The Shareholders' Standing**

Under Rule 23.1, plaintiffs bringing derivative actions must have owned shares of the corporation at the time the challenged transaction took place.  Fed. R. Civ. P. 23.1; *see also Kona Enters., Inc. v. Estate of Bishop*, 179 F.3d 767, 769-79 (9th Cir. 1999); *Lewis v. Chiles*, 719 F.2d 1044, 1047 (9th Cir. 1983).  A plaintiff's allegation of ownership must be sufficiently particularized.  *See, e.g.*, *In re Computer Sci. Corp. Derivative Litig.*, No. CV 06-05288 MRP, 2007 WL 1321715, at *15 (C.D. Cal. Mar. 26, 2007) (holding that a complaint stating the plaintiffs owned stock "during the relevant period," was insufficient to allege contemporaneous ownership during the time period in which the questioned transactions occurred).

In this case, the shareholders do not allege with sufficient particularity that they owned TriQuint shares during the relevant time periods.  The Complaint states they owned TriQuint stock at "times relevant."  Compl. (#15) ¶¶ 17-18, 106.  This general allegation is not sufficiently particular and is, in fact, inaccurate by the shareholders' own admissions.  In their response to the Motions to Dismiss, the shareholders state: "Ms. Belova has held her stock continuously since April 2000 and Mr. Bullard has held his stock . . . continuously since January 1999." Consolidated Opp'n to Mots. to Dismiss (#30) 36.  These facts are not contained in the Complaint, and they are an admission that the shareholders did not own TriQuint stock when at least some of the grants were allegedly made.  The shareholders argue this shortcoming does not merit dismissal.  However, such varying allegations are "the precise reason why Plaintiffs must [particularly] allege contemporaneous ownership of . . . stock during all periods relevant to the

PAGE 6 OPINION & ORDER

. . . transactions." *In re Computer Sci.*, 2007 WL 1321715, at *15; *see also*, *Zoran*, 511 F. Supp.

2d at 1009-10 (discussing the contemporaneous ownership requirement); *Ryan v. Gifford*, 918

A.2d 341, 359 (Del. Ch. 2007) (same).

Based on the foregoing, I GRANT the Motions to Dismiss (#20 & #22) without prejudice

and with leave to amend.  An Amended Complaint is due by March 28, 2008.  Because I assume

the shareholders will file an Amended Complaint, I now address the defendants' other arguments

for dismissal.

**III.    The Motions to Dismiss**

The defendants rely on the argument that the shareholders have not sufficiently alleged

backdating.  If the shareholders have not alleged backdating, then it is impossible for them to

sufficiently allege the other purported violations of federal and state law.

**A.    *Backdating***

The shareholders employed two analytical models to identify the eight options grants as

backdated: (1) the Center for Financial Research and Analysis ("CFRA") methodology, and

(2) the Merrill Lynch methodology.  *See* Consolidated Opp'n to Mots. to Dismiss (#30) 7-8;

Compl. (#15) ¶¶ 54-62.  The CFRA methodology "individually analyzed . . . stock options grants,

looking for any options where the price on the grant date was within 105% of the ten-day or

forty-day periodic low point in stock price and where the price range within that period was more

than ten percent of the lowest stock price." *In re CNET Networks, Inc. S'holder Derivative Litig.*,

483 F. Supp. 2d 947, 957 (N.D. Cal. 2007) (discussing and accepting the CFRA methodology).

The Merrill Lynch methodology "compared annualized 20-day stock returns following option

pricing events to the stock's calendar year annual return" to identify suspicious options pricing

activities. *Conrad v. Blank*, __A.2d__, No. 2611-VCL, 2007 WL 4788447, at *8 n.30 (Del. Ch. Sept. 7, 2007) (discussing and accepting the Merrill Lynch methodology)*; see also Ryan*, 918 A.2d at 355 n.34 (same). Also, the shareholders point out that at least one court has accepted an *ad hoc* methodology, "not entirely revealed," to support a claim for backdating. *E.g.*, *Zoran*, 511 F. Supp. 2d at 1004-06 (discussing and accepting an unidentified methodology that identified grants at low points and calling the pattern "hugely suspicious").

The defendants argue the shareholders' analysis has many shortcomings. They argue:

(1)    The shareholders have selectively chosen eight of at least twenty-two grants made to officers and directors between 1998-2002.

(2)    The shareholders use their methodology inconsistently—they review TriQuint's stock price at 10- or 20-day intervals depending on when the facts suit them.

(3)    Return analysis refutes backdating.

(4)    The options were not granted at the year's low.

(5)    The grants do not have the typical indicia of backdating, such as restated financial statements.

(6)    The grants are not dated after a sharp drop or before a substantial rise.

*See* TriQuint's Memo. in Supp. of Mot. to Dismiss (#23) 12-18. Additionally, the SEC has informally investigated TriQuint's stock options granting practices and decided not to take any enforcement action against TriQuint. *See* Supp. Decl. of Kelley M. Kinney (#40), Ex. A.

Despite the shortcomings of the shareholders' analysis, I draw reasonable inferences in their favor. *See, e.g.*, *Associated Gen. Contractors*, 159 F.3d at 1181. The many shortcomings listed above are subject to competing inferences, explained as follows:

(1)    The shareholders do not need to allege that every grant has been backdated; they may select eight grants and allege that only those eight have been backdated.

(2)    The shareholders' inconsistent use of their own methodology is the most troubling. It is unclear which use I should accept and which use I should reject. Despite this concern, for purposes of the Motions to Dismiss, I can reasonably infer backdating from the shareholders' Complaint.

(3)    For purposes of the Motions to Dismiss, I need not consider how return analysis may or may not refute backdating—that is, I will not weigh the evidence or lack thereof.

(4)    Lower stock prices on dates other than the grant dates do not necessarily indicate backdating did not occur. It may simply mean the backdating scheme is more sophisticated and more difficult to identify through statistical analyses.

(5)    The lack of typical indicia of backdating may also indicate the defendants' scheme is more sophisticated than the average backdating scheme.

(6)    The grants not being dated after a sharp drop or before a sharp rise may indicate the backdating scheme was more sophisticated than the average scheme.

(7)    Finally, the SEC may have decided not to take any enforcement action against TriQuint for any number of reasons. Those reasons could include resources, internal policies, or the strength of the case. The SEC's inaction does not necessarily indicate backdating did not occur.

Based on the shareholders' analysis, I may reasonably infer backdating occurred for purposes of the Motions to Dismiss. "Given the choice between improbable good fortune and knowing manipulation of option grants, . . . [I] may reasonably infer the latter . . . ." *See Ryan*, 918 A.2d at 355 n.34. The shareholders have alleged a striking pattern in stock option grants at TriQuint, which may indicate backdating. The above-mentioned shortcomings and the SEC's recent decision not to take any enforcement action against TriQuint presumably will play a persuasive role in upcoming dispositive motions but have less of a role in the Motions to Dismiss.

**B.    *The § 10(b) Claim***

Section 10(b) of the Securities Exchange Act of 1934 forbids (1) the "use or

employ[ment] . . . of any . . . deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" SEC "rules and regulations." 15 U.S.C. § 78j(b). Rule 10b-5 forbids, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b-5(b).  From this statute and Rule, courts have implied a private damages action, similar to common-law tort actions for deceit and misrepresentation.  *See, e.g.*, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196 (1976)*; Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730, 744 (1975).  The private action also has statutory requirements.  *E.g.*, 15 U.S.C. § 78u-4(b)(4) (discussing loss causation).

A private action under § 10(b) and Rule 10b-5 has six basic elements.  They are: (1) material misrepresentation or omission; (2) scienter—i.e., a wrongful state of mind; (3) connection with the purchase or sale of a security; (4) reliance—i.e., "transaction causation"; (5) economic loss; and (6) "loss causation"—i.e., a connection between the misrepresentation and the loss.  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

First, the Complaint alleges TriQuint's filings misrepresented that options were granted with an exercise price at fair market value as of the date of the grant.  *See* Compl. (#15) ¶¶ 70, 73, 76, 82, 85, 88, 91, 94ˎ 97, 113, 116, 119, 125, 128, 131, 134.  Because these stock options were allegedly backdated, TriQuint's filings allegedly misrepresented material facts.  For the same reason, the Complaint also alleges TriQuint's financial statements were materially false and misleading.  *See id.* ¶¶ 111, 112, 115, 118, 121, 124, 127, 130, 133.

Second, the Complaint alleges facts that give a strong inference of scienter.  It alleges the defendants prepared or approved false and misleading public statements relating to the stock

options in question. *See id.* ¶¶ 20-32. "[S]cienter is properly alleged when the complaint alleges

both false statements and the defendants' close involvement in the preparation of those

statements." *Zoran*, 511 F. Supp. 2d at 1013 (citing *In re Daou Sys., Inc., Sec. Litig.*, 411 F.3d

1006, 1022-24 (9th Cir. 2005)). Furthermore, scienter is typically present in backdating schemes.

*See,e.g.*, *Ryan*, 918 A.2d at 355 n.35 ("[I]t is difficult to understand how a plaintiff can allege that

directors backdated options *without* simultaneously alleging that such directors *knew* that the

options were being backdated.").

Third, the Complaint alleges the material misrepresentations or omissions occurred in

connection with stock options. A stock option is a "sale under the securities laws because it is a

contract to sell a security when the option is exercised." *Falkowski v. Imation Corp.*, 309 F.3d

1123, 1130-31 (9th Cir. 2002) (finding that fraud with respect to employee stock option plans

was "'in connection with' the 'sale or purchase of a covered security'"); *see also* 15 U.S.C.

§78c(a)(10) (defining "security" to include any "option"). The shareholders allege

misrepresentations of the value and date of stock option grants, which necessarily are

misrepresentations "in connection with" the purchase or sale of a security. *See Falkowski*, 309

F.3d at 1131.

Fourth, the Complaint alleges TriQuint relied on its financial and related statements when

issuing stock. It allegedly increased authorized stock and granted options based on the allegedly

false or misleading statements. *See* Compl. (#15) ¶¶ 5, 9-10, 111-12, 115, 118, 121, 124, 127,

130, 133, 139, 141, 156.

Fifth, the Complaint alleges TriQuint suffered substantial economic harm because of the

alleged backdating. *See id.* ¶¶ 8-12, 39-40, 139, 156. It also alleges the backdating wasted

valuable corporate assets.  *Id.*

Sixth, the Complaint alleges loss causation because the alleged backdating scheme is necessarily connected to the alleged economic losses.  *Id.*  The economic losses discussed in the complaint flow from the alleged backdating scheme.

In sum, the shareholders sufficiently allege a §10(b) claim because the Complaint, as a whole, alleges each of the six elements as to each defendant.

### C.    *The § 14(a) Claim*

Section 14(a) prohibits the use of "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b). "To state a claim under Section 14(a), a plaintiff must establish that '(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation, [rather than the particular defect in the solicitation materials], was an essential link in the accomplishment of the transaction.'"  *Knollenberg v. Harmonic, Inc.*, 152 F. App'x. 674, 682 (9th Cir. 2005) (alteration in original) (quoting *Atl. Coast Airlines Holdings, Inc. v. Mesa Air Group, Inc.*, 295 F. Supp. 2d 75, 81-82 (D.D.C. 2003)); *see also* 15 U.S.C. §78j(b); 17 C.F.R. § 240.14a-9.  Furthermore, "[s]ection 14(a) 'lacks any reference to . . . indicate a requirement of scienter.'  Accordingly, negligence is sufficient to support a claim for a violation of Section 14(a)."  *Knollenberg*, 152 F. App'x. at 682-83 (quoting *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1263 (N.D. Cal. 2000)).

In this case, the shareholders have adequately alleged proxy statements contained misrepresentations relating to the allegedly backdated stock options.  *See* Compl. (#15) ¶¶ 66-98.

PAGE 12 OPINION & ORDER

Furthermore, the Complaint alleges TriQuint suffered economic harm because of the alleged

backdating. *See id.* ¶¶ 8-12, 39-40, 139, 156. The shareholders' allegations also support an

inference that the defendants were negligent because they did not discover or stop the alleged

backdating scheme. *See Zoran*, 511 F. Supp. 2d at 1016 (discussing similar allegations and

concluding they "lead to the inference that the compensation committee neglected its duty and

was thus negligent"). The key question thus becomes whether or not the shareholders allege the

proxy statements are an essential link.

The Complaint alleges TriQuint shareholders voted in directors, authorized stock option

plans, and authorized increasing the number of shares of stock because of the allegedly false

proxy statements. *See* Compl. (#15) ¶¶ 66-98. "If defendants had not falsely stated in . . . proxy

statements that stock options were being granted properly under the plans, and that directors were

complying with the terms of the plans that the shareholders approved, shareholders would have

voted those board members out, and the board members would no longer have had the means to

grant more backdated stock options." *Zoran* 511 F. Supp. 2d at 1016. The proxy statements are

therefore an essential link, and the shareholders state a claim under §14(a).

    **D.**    ***The State Law Claims***

        **1.**    **Duties of Loyalty and Care**

Under Delaware law, there are two fiduciary duties: loyalty and care. *See Stone ex rel.*

*AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 367 (Del. 2006). A claim for a breach of these

fiduciary duties sounds in fraud and must be pleaded with particularity as required by Federal

Rule of Civil Procedure 9(b). *See Sachs v. Sprague*, 401 F. Supp. 2d 159, 170 n.15 (D. Mass.

2005); *York Linings v. Roach*, No. 16622-NC, 1999 WL 608850, at *2 (Del. Ch. July 28, 1999)

(holding breaches of the duties of loyalty and care must be pleaded with particularity).  To meet the heightened standard, a plaintiff must identify what is false or misleading, and why.  *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).  Furthermore, a plaintiff must rebut the presumption of the business judgment rule.  *See, e.g.*, *Aronson* , 473 A.2d at 812 ("The business judgment rule . . . is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."); *McKesson*, 126 F. Supp. 2d at 1278 ("[T]he complaint must contain well-pleaded allegations to overcome the presumption that the directors' decisions were informed and reached in good faith.").

The Complaint alleges with particularity a breach of the duties of loyalty and care.  The Complaint lists each defendant and discusses what he or she allegedly did to facilitate the backdating scheme and disseminate false information through SEC filings.  *See* Compl. (#15) ¶¶ 20-31.  The Complaint, taken as a whole, also alleges each defendant acted in bad faith.  "[An] [i]ntentional violation of a shareholder approved stock option plan, coupled with fraudulent disclosures regarding the directors' purported compliance with that plan, constitute conduct that is . . . an act in bad faith." *Ryan*, 918 A.2d at 358.  It is difficult to fathom a situation where the deliberate violation of a shareholder approved stock option plan and false disclosures is anything but an act of bad faith in violation of the duties of loyalty and care.  *See Zoran*, 511 F. Supp. 2d at 1017.

The defendants argue they cannot be liable for a breach of the duty of care because TriQuint's charter has an exculpatory provision.  If a company has adopted such a provision, its directors cannot be held liable for money damages for unintentional breaches of their fiduciary

PAGE 14 OPINION & ORDER

duties.  *See, e.g.*, *Aronson*, 473 A.2d at 813 n.6 (discussing the authorities).  However, the

defendants' argument constitutes an affirmative defense that will not dispose of a matter at the

pleading stage.  *See Emerald Partners v. Berlin*, 726 A.2d 1215, 1223-24 (Del. 1999) (holding

the use of exculpatory provisions to shield directors from personal liabilities presents an

affirmative defense, and the party asserting the defense bears the burden of establishing it).  The

shareholders thus state a claim for breach of the duty of care, but the defendants may establish

their affirmative defense in the future.

### 2.    Insider Trading

The defendants also argue the shareholders do not state a claim for insider trading.  To

state a claim for insider trading under Delaware law a plaintiff must allege (1) "the corporate

fiduciary possessed material, nonpublic company information"; and (2) "the corporate fiduciary

used that information improperly by making trades because she was motivated, in whole or in

part, by the substance of that information."  *In re Oracle Corp. Derivative Litig.*, 867 A.2d 904,

934 (Del. Ch. 2004), *aff'd*, 872 A.2d 960 (Del. 2005).

The shareholders allege certain defendants participated in the backdating scheme and sold

their stock based on this material, non-public information.  *See* Compl. (#15) ¶¶ 99-101.  The

shareholders therefore state a claim for insider trading under Delaware law.  *See Zoran*, 511 F.

Supp. 2d at 1018 (holding that plaintiffs stated a claim for insider trading when they alleged

participation in a backdating scheme and subsequent sale of stocks).

### 3.    Corporate Waste

To plead a claim for waste of corporate assets, a "plaintiff must overcome the general

presumption of good faith by showing that the board's decision was so egregious or irrational that

it could not have been based on a valid assessment of the corporation's best interests." *White v. Panic*, 783 A.2d 543, 554 n.36 (Del. 2001). "Directors are guilty of corporate waste, only when they authorize an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *Glazer v. Zapata Corp.*, 658 A.2d 176, 183 (Del. Ch. 1993).

Because the shareholders adequately plead backdating, they state a claim for corporate waste. "Backdating is a form of fraud. In the face of such allegations, defendants simply cannot be said to have acted in the company's best interest. Accordingly, plaintiff has pled a claim for corporate waste under Delaware law." *Zoran*, 511 F. Supp. 2d at 1019. The crux of the backdating allegation is that the decision to backdate "was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests." *See White*, 783 A.2d at 554 n.36.

### 4.    Gross Mismanagement and Abuse of Control

To state a cause of action for gross mismanagement, a plaintiff must plead facts showing that defendants were "recklessly uninformed" or acted "outside the bounds of reason." *Cincinnati Bell Cingular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati, Inc.*, No. 13389, 1996 WL 506906, at *14 (Del. Ch. Sept. 3, 1996), *aff'd*, 692 A.2d 411 (Del. 1997). The shareholders allege the defendants participated in a backdating scheme and produced false proxy statements. Such conduct is either "recklessly uninformed" or "outside the bounds of reason." Therefore, the Complaint, taken as a whole, sufficiently alleges a claim for gross mismanagement and abuse of control.

### 5.    Claims for Accounting, Waste, Unjust Enrichment, and Recision

The defendants' brief states:

> Accounting, unjust enrichment and rescission are all equitable remedies.  As
> discussed above, plaintiffs fail to adequately plead any of the claims that trigger
> these remedies.  Thus, the Court should also dismiss these claims.  *See Allegheny
> Gen. Hosp. v. Phillip Morris, Inc.*, 228 F.3d 429, 446-67 (3d Cir. 2000)
> (dismissing unjust enrichment claim necessary when traditional tort claims were
> also dismissed); *McCormick v. Fund Am. Cos., Inc.*, 26 F.3d 869 (9th Cir. 1994)
> (dismissing rescission claim where underlying claims dismissed).

Individual Defs.' Memo. in Supp. of Mot. to Dismiss (#21) 22-23.  Because this argument relies

on me dismissing the other claims, it fails.

### E.    *The Statutes of Limitation*s

The defendants argue all of the shareholders' federal and state law claims are time barred.

*See id.* at 11-13, 15-16, 23.  The shareholders argue the applicable statutes of limitations have not

run or were equitably tolled.  *See* Consolidated Opp'n to Mots. to Dismiss (#30) 54-59.

The statute of limitations for a § 10(b) claim is "two years from the discovery of facts

constituting the violation but no more than five years from the date of the violation."  *Zoran*, 511

F. Supp. 2d at 1013 (citing 28 U.S.C. § 1658(b)(1)(2)).  The five year limitations period "serves

as a statute of repose in lieu of equitable tolling."  *Id.* at 1013-14 (citing *Lampf, Pleva, Lipkind,

Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363 (1991)).  Because outsiders like the

shareholders do not have "superpowers to detect secret backdating inside the company," the five

year statute of limitations applies.  *See id.* at 1014; *see also Ryan*, A.2d at 359.  The shareholders

argue the statute of limitations begins to run from the last alleged misrepresentation, but they are

incorrect.  *See Durning v. Citibank, Int'l*, 990 F.2d 1133, 1136 (9th Cir. 1993) (rejecting a

plaintiff's argument that the statue of limitations for an allegedly fraudulent offering of bonds was

extended by continued fraud through the redemption of the bonds).  The initial Complaint (#1) in

this case was filed on February 28, 2007, so the shareholders cannot base a § 10(b) claim on

alleged backdating that occurred before February 28, 2002, regardless of when they first learned

of the alleged backdating scheme.

The statute of limitations for § 14(a) "is one year from the discovery of the occurrences

giving rise to the claim, but no later than three years from the date of the violation." *Zoran*, 511

F. Supp. 2d at 1017.  The analysis in the previous paragraph also applies here.  Therefore, the

three year statute of limitations applies, and the shareholders cannot base a § 14(a) claim on

proxy statements filed before February 28, 2004, regardless of when they first learned of the

alleged backdating scheme.

For the state law claims, the statute of limitations is three years.  Del. Code Ann. tit. 10, §

8106; *see also Zoran*, 511 F. Supp. 2d at 1019.  Delaware courts often find that the statute of

limitations is tolled when defendants engage in "fraud or concealment of the facts which would

have disclosed" the wrongdoing.  *Kahn v. Seaboard Corp.*, 625 A.2d 269, 276 (Del. Ch. 1993);

*see also Ryan*, 918 A.2d at 359-60 ("Inaccurate public representations as to whether directors are

in compliance with shareholder-approved stock option plans constitute fraudulent concealment of

wrongdoing sufficient to toll the statute of limitations.")  At this stage, therefore, the statute of

limitations for the state law claims was tolled because of the alleged fraud or concealment.

## IV.    The Shareholders' Demand Futility Allegations are Sufficient

"A shareholder seeking to vindicate the interests of a corporation through a derivative suit

must first demand action from the corporation's directors or plead with particularity the reasons

why such demand would have been futile." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d at

PAGE 18 OPINION & ORDER

989.  "A trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences."  *Grobow*, 539 A.2d at 187.  Here, the shareholders do not allege they made a demand on the board.  They instead plead demand was excused because it would have been futile.  "[A] court that is entertaining a derivative action . . . must apply the demand futility exception as it is defined by the law of the State of incorporation."  *Kamen*, 500 U.S. at 108-09.  TriQuint is incorporated in Delaware, so Delaware law applies.

Delaware courts apply two tests for determining when demand is futile.  If a derivative action challenges a board's affirmative decisions, then demand is excused if "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."  *Aronson*, 473 A.2d at 814.  A different test applies if the current directors failed to act.  "[A] court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."  *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).  Furthermore, the plaintiff must show that a majority of directors were interested or not independent.  *See Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1046 (Del. 2004).

The parties agree that the test outlined in *Aronson* applies.  The shareholders allege: "Based upon the facts set forth throughout [the] . . . Complaint . . . a pre-filing demand upon the TriQuint Board . . . is excused as futile."  Compl. (#15) ¶ 107.  "Five of seven of TriQuint's

PAGE 19 OPINION & ORDER

directors engaged in backdating stock options and all approved false and misleading SEC

filings." *Id.* ¶ 108 (providing a table).  They also allege four of the seven board members

engaged in some form of insider trading (based on the backdating scheme).  *See id.* ¶¶ 101-09.

As discussed above, the backdating scheme is not likely a valid exercise of business judgment.

This leads to "a reasonable doubt . . . that: (1) the directors are disinterested and independent and

(2) the challenged transaction was otherwise the product of a valid exercise of business

judgment."  *See Aronson*, 473 A.2d at 814.  The shareholders have therefore sufficiently alleged

demand futility.[5]  *See Zoran*, 511 F. Supp. 2d at 1002-03 ("[D]emand is excused based on

plaintiff's first theory—[all current board members received backdated stock options].").

## CONCLUSION

Because the shareholders do not properly allege standing, I GRANT the defendants'

Motions to Dismiss (#20 and #22) without prejudice and with leave to amend.  Once an

appropriately Amended Complaint is filed, the shareholders will have standing to pursue claims

related to the transactions that occurred when they owned TriQuint stock.  The Amended

Complaint should also otherwise conform with the foregoing discussion to survive future

---

[5] As the *Zoran* court stated:
[D]irectors receiving backdated stock options receive a benefit *not* shared by
stockholders. . . . [S]hareholders do not have the benefit of reaching back in time
to buy their shares at low-price point.  Furthermore, if a corporate decision will
have a materially detrimental impact on the director, but not the corporation or its
stockholders, a director can be considered interested.  Thus, a decision now to
correct the grant dates would have a detrimental impact on the directors by
removing the financial benefit of the backdating.  The director may be required to
pay back the difference in price between the true grant date and the purported
grant date.  The directors may even face legal exposure.  Accordingly, if . . . the
directors received backdated grants, those directors will be considered interested.
*Zoran*, 511 F. Supp. 2d at 1002-03.

PAGE 20 OPINION & ORDER

Motions to Dismiss.  The Amended Complaint is due March 28, 2008.[6]

IT IS SO ORDERED.

DATED this  13th  day of March, 2008.

/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Court

_____

[6] I also DISMISS the Motion for Leave to File a Supplemental Exhibit (#39) as moot.

PAGE 21 OPINION & ORDER